[Cite as *State v. Lovato*, 2014-Ohio-2311.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                               :

    Plaintiff-Appellee                    :            C.A. CASE NO.    25683

v.                                          :            T.C. NO.    06CR185

DAVID P. LOVATO                             :            (Criminal appeal from
                                                         Common Pleas Court)

    Defendant-Appellant                   :

                                            :

. . . . . . . . . .

## O P I N I O N

Rendered on the    30th    day of    May   , 2014.

. . . . . . . . . .

ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

CARRIE WOOD, Atty. Reg. No. 0087091, Assistant State Public Defender, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215
    Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, P.J.

    **{¶ 1}** David P. Lovato was convicted after a jury trial in the Montgomery

County Court of Common Pleas of four counts of rape by force or threat of force (Counts 1, 4, 5, and 6), two counts of felonious assault (Counts 3 and 8), two counts of kidnapping (Counts 2 and 7), and one count of intimidation of a crime victim or witness (Count 9). Counts One through Eight each contained repeat violent offender and sexually violent predator specifications. The kidnapping and felonious assault counts also contained a sexual motivation specification. The trial court sentenced Lovato to an aggregate term of 76 years to life in prison.

{¶ 2} In this delayed appeal, Lovato claims that the trial court erred in failing to merge allied offenses of similar import, that his attorney rendered ineffective assistance by failing to ask the court to merge allied offenses of similar import, that the trial court should have suppressed his confession, and that there was insufficient evidence to support his conviction for intimidating a witness. For the following reasons, the trial court's judgment will be affirmed.

## I. Allied Offenses of Similar Import

{¶ 3} Lovato's first assignment of error claims that "the trial court committed plain error when it imposed separate sentences for allied offenses of similar import."

{¶ 4} R.C. 2941.25, Ohio's allied offense statute, provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of

dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 5}    "When determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, syllabus.[1]   The Ohio Supreme Court explained:

* * * [T]he question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. * * * If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." * * *

If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

---

[1]   The State argues that Lovato's allied offense argument should be reviewed under *State v. Rance*, 85 Ohio St.3d 632, 710 N.E.2d 699 (1999), because Lovato did not timely appeal his conviction and thus his case had become final.    We have allowed Lovato to pursue a delayed direct appeal from his conviction, and we conclude that it is appropriate to apply the supreme court authority in effect at this time.

Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge.

(Citations and quotations omitted.) *Johnson* at ¶ 48-51.

{¶ 6} Lovato's felony convictions stem from two separate incidents – one involving H.C. and the other involving T.M. – in which Lovato kidnapped, assaulted, and raped the complainant. Lovato claims that the kidnappings were incidental to the rapes and that the felonious assaults were incidental to the kidnappings. He asserts that the charges relating to each incident should be merged as allied offenses of similar import.

{¶ 7} According to the evidence at trial, shortly before midnight on January 16, 2006, H.C. drove to the Foundry night club in Dayton to socialize with two friends. While there, a man wearing a white suit and a fedora introduced himself as MJ 3000; the man was later identified as Lovato. Lovato told H.C. that he took photographs, and he offered to take one of her. H.C. agreed to have her picture taken, but she told Lovato that she had a boyfriend. As the night club was closing, Lovato asked H.C. for a ride home. H.C. agreed because she "was being friendly" and Lovato said he lived "right up the street."

{¶ 8} H.C. was unfamiliar with the Dayton streets, and Lovato directed her farther away from night club than she expected. Lovato eventually directed her to stop in an alley and repeatedly invited her inside his house. When H.C. declined, Lovato began punching H.C. in the face and told her that she had three seconds to get in the back seat of the car. H.C. complied, but Lovato punched her three or four more times. H.C.'s nose was broken by Lovato's blows. Lovato told H.C. to remove her pants and to lay on her stomach, and he

then vaginally raped her with his penis. Lovato also tried to lick H.C.'s vagina and anus. Lovato asked H.C. to perform oral sex on him, but she told him that she did not feel well. Lovato told H.C. to "talk dirty" to him, and he alternated between threatening her and saying that he wanted to have children with her. H.C. testified that the ordeal lasted for two and a half to three hours. After Lovato was finished, he asked for H.C.'s phone number and for a hug. Lovato allowed H.C. to drive away from the alley at approximately 7:00 a.m. on January 16. Lovato was ultimately charged with one count each of rape, kidnapping, and felonious assault related to this incident.

{¶ 9}   At approximately 8:00 p.m. on that same day (January 16), T.M. got off a bus on North Main Street, between Hudson and Fairview Avenues, in Dayton, where she had arranged to meet her boyfriend. While she waited, T.M. asked someone where she could purchase cigarettes and was told to try the nearby United Foods store. T.M. spoke for a couple of minutes with a man inside United Foods; he introduced himself as MJ 3000 and was later identified as Lovato. T.M. walked out of the store and smoked a cigarette; Lovato soon followed and talked with T.M. Lovato told T.M. that she "should not be out there by herself. There's lots of rapists and pedophiles in the area." Lovato said that if T.M. would go with him to drop off his cell phone at his sister's house, he would wait with her for her boyfriend at the bus stop. T.M. went to Lovato's sister's home, stayed for ten minutes, and then walked with Lovato back to the bus stop.

{¶ 10}   T.M.'s boyfriend arrived on a bus, and T.M. introduced him to Lovato. Lovato assured the boyfriend that he had looked out for T.M. until he (her boyfriend) got there. T.M. and her boyfriend tried to walk away from Lovato, but Lovato followed. The

boyfriend decided to go into a nearby Rite Aid while T.M. went back to the bus stop with Lovato. As T.M. and Lovato walked passed the United Foods store, Lovato hit T.M. in the face and side of the head. T.M. lost consciousness. When she came to, Lovato was dragging her by her coat hood into a garage in the alley between Hudson and Norman Avenues. In the garage, Lovato told her to pull down her pants so he could "smell her." T.M. tried to run out of the garage, but Lovato caught her, choked her until she passed out, pulled down her pants and underwear, and dragged her back into the garage. Lovato pushed her face into a shelving unit and began to masturbate. He then raped T.M. anally and vaginally with his penis, and put his fingers inside her vagina and anus. Lovato told T.M. that he ejaculated eight times. When he was finished, Lovato walked T.M. back to the bus stop. At approximately 10:00 p.m., while at the bus stop, T.M. contacted her boyfriend's father and asked him to come get her. Lovato was later charged with three counts of rape and one count each of kidnapping and felonious assault related to his actions toward T.M.

{¶ 11} At the outset, we note that each of the felonious assault and kidnapping offenses contained a sexual motivation specification, and the jury found that Lovato committed these offenses "for the purpose of gratifying his sexual needs or desires." The Ohio Supreme Court has interpreted the term "animus" to mean "purpose or, more properly, immediate motive." *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979). "If the defendant acted with the same purpose, intent, or motive in both instances, the animus is identical for both offenses." *State v. Lewis*, 12th Dist. Clinton No. CA2008-10-045, 2012-Ohio-885, ¶ 13; *see also State v. Beverly*, 2d Dist. Clark No. 2011 CA 64, 2013-Ohio-1365, ¶ 42. Considering the sexual motivation finding with respect to the

kidnapping and felonious assault charges, Lovato reasonably argues that he acted with a single animus in committing the rapes, kidnappings, and felonious assaults.

{¶ 12} In our view, the sexual motivation finding does not necessarily require a conclusion that the felonious assault, rape, and kidnapping offenses for each victim must merge, because such a conclusion fails to consider whether the kidnappings, felonious assaults, and rapes were committed by the same conduct.

{¶ 13} The Supreme Court of Ohio stated that a separate animus for kidnapping exists where (1) "the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense," or (2) "the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime." *State v. Logan*, 60 Ohio St.2d 126, 397 N.E.2d 1345 (1979), syllabus; *see also State v. Rucker*, 2d Dist. Montgomery No. 24340, 2012-Ohio-4860, ¶ 52. Although focused on the animus aspect of the allied offense analysis, these factors are also reasonable considerations for determining whether the defendant committed kidnapping as separate conduct from other offenses. *See State v. Ware*, 63 Ohio St.2d 84, 406 N.E.2d 1112 (1980).

{¶ 14} In *Ware*, the defendant and the minor-complainant were at the home of the complainant's friend. When the complainant was unable to find a telephone to request a ride home, the defendant offered to let her use the telephone at his home. The complainant then accompanied the defendant to his residence, which was a substantial distance away. Upon getting there, the defendant said that he did not have a telephone and began making advances toward the complainant. When the complainant resisted, the defendant carried her

upstairs and raped her. The Supreme Court commented that the rape and kidnapping might be allied offenses if the only facts were that the defendant forcibly moved the complainant from the lower level of the home to the upstairs bedroom. *Id*. at 87. The court held, however, "that there was an act of asportation by deception which constituted kidnapping, and which was significantly independent from the asportation incidental to the rape itself. The two crimes were committed separately." *Id*.

{¶ 15} Lovato first claims that the kidnappings were incidental to the rapes. Beginning with H.C., the State argues, and we agree, that Lovato lured H.C. from the nightclub to the alley behind Lovato's home, and that this conduct was significantly independent of the rapes. H.C. told Lovato that she would give him a ride home if it was nearby. Lovato assured H.C. that he lived "right up the street." In reality, Lovato's home was a significant distance away from the nightclub, and H.C. was unfamiliar with the area where he lived. Upon arriving in the alley, Lovato made advances toward H.C., even though H.C. had told Lovato at the nightclub that she had a boyfriend. When H.C. rejected Lovato's advances, he repeatedly raped her in the car.

{¶ 16} R.C. 2905.01(A)(4) prohibits any person, "by force, threat, or deception," from removing another person from the place where the other person is found or restraining the liberty of the other person for the purpose of engaging in sexual activity with the other person against his or her will. The evidence at trial reflects that Lovato deceived H.C. into driving him to the alley behind his home, which was a significant distance from the nightclub, and that this asportation constituted a distinct act of kidnapping that was separate from the subsequent rapes. Further, the continued forcible restraint of H.C. in the car was

not incidental to the sexual assault. H.C. testified to vaginal rape by Lovato and his attempt to lick her anus and vagina. She stated, however, that her detention lasted for two and a half to three hours, well beyond the time associated with committing the sexual assault. While this detention was part of the same animus (sexual motivation), it was distinct conduct from the single act of rape of which he was convicted regarding H.C.

{¶ 17} Lovato's kidnapping and rape of T.M. presents a closer question. Lovato argues that T.M. voluntarily followed him to the alley by the United Foods store. Lovato pulled her into the garage so he could rape her, and when T.M. tried to get away, he dragged her back into the garage so he could continue to sexually assault her. He asserts that T.M. was not restrained for any period of time that was not related to the rapes and was not transported a significant distance.

{¶ 18} Many aspects of T.M.'s kidnapping support Lovato's argument. T.M. arrived at the bus stop at approximately 8:00 p.m. and at least 15 minutes passed before her boyfriend arrived on the bus. T.M. returned to the bus stop after the rapes at approximately 10:00 p.m. Based on the timeline provided by T.M. (which was substantially corroborated by her boyfriend's father, police officers, and the United Foods's security officer), the multiple rapes occurred over a period of less than two hours. The trial testimony further reflects that Lovato assaulted T.M. by the United Foods store, which was close to both the bus stop where T.M. was heading and the location of the rape, and dragged her into a nearby garage. Throughout the time that T.M.'s liberty was restrained, Lovato repeatedly raped her. Once the rapes were completed, Lovato allowed T.M. to put on her underpants and pants. T.M. was permitted to use her cell phone, and after walking to the bus stop, she

called her boyfriend's father to pick her up. Although T.M. was held for more than an hour, the record does not demonstrate that T.M. was moved a significant distance or that she was held for a significant period of time other than for the purpose of raping her. Although Lovato walked her to the bus stop and waited there with her, T.M. was permitted to arrange for transportation, which she took.

{¶ 19} We nevertheless conclude that T.M.'s kidnapping was not merely incidental to the rape. Lovato dragged T.M. through the alley to the nearby garage while she was unconscious. According to T.M.'s testimony, before any rapes occurred, T.M. attempted to escape, and she ran out of the garage and back toward United Foods. Lovato caught up with her, choked her, and dragged her back to the garage by her coat. T.M. stated that the hood of her coat cut off her circulation and made her pass out again. At some point while T.M. was unconscious, Lovato pulled down T.M.'s pants and underwear to her ankles, and he dragged her "bare skin on the gravel back to the garage." With T.M.'s escape and recapture, Lovato engaged in a significant course of conduct to subdue T.M. prior to sexually assaulting her. This conduct greatly increased the risk of harm to T.M., and it took on a significance distinct from the rapes themselves, which occurred after T.M. was recaptured. The trial court did not err in failing to merge the kidnapping with the rape.

{¶ 20} Lovato further argues that the felonious assaults of H.C. and T.M. should have been merged with the kidnapping offenses. He argues that the felonious assaults and kidnappings were committed with a single animus and the physical assaults were incidental to the kidnappings and rapes. As with the kidnapping charges, the jury found that the felonious assaults were committed with a sexual motivation, and we agree that the felonious

assaults were committed for the purpose of facilitating the rapes. Nevertheless, we conclude that the felonious assaults were separate acts, and the trial court did not err in failing to merge the offenses.

{¶ 21} As discussed above, the kidnapping of H.C. began when Lovato deceived H.C. into giving him a ride to his home. H.C. was not assaulted while she was driving Lovato to his residence. When H.C. refused Lovato's advances in the alley, Lovato punched H.C. in the face several times and told her that she had three seconds to get in the back seat of the car. H.C. complied, but Lovato punched her three or four more times. After this assault, Lovato raped H.C. and restrained her for several hours. Although the felonious assault occurred while H.C. was restrained by Lovato, it was a separate act from the kidnapping by deception and it did not involve conduct that was necessary to restrain her in the car for the purpose of raping her.

{¶ 22} The felonious assault of T.M. was similar to that of H.C. As H.C. and Lovato were walking past the United Foods store, Lovato punched T.M. in the face and the side of the head. T.M. "saw spots," lost consciousness, and "came to" while Lovato was dragging her by the hood of her coat into the garage. Lovato's actions of punching T.M. at the United Foods store were separate conduct from the kidnapping and the rapes.

{¶ 23} Lovato's first assignment of error is overruled.

## II. Ineffective Assistance of Counsel

{¶ 24} Lovato's second assignment of error claims that his trial counsel "was ineffective because he did not ask the trial court to merge allied offenses of similar import."

{¶ 25} To reverse a conviction based on ineffective assistance of counsel, an

appellant must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688.

{¶ 26} In light of our disposition of Lovato's first assignment of error, we cannot conclude that he was prejudiced by counsel's failure to argue that his offenses were allied offenses of similar import. Lovato's second assignment of error is overruled.

### III. Voluntariness of Lovato's Confession

{¶ 27} Lovato's third assignment of error states:

The police coerced Mr. Lovato's confession by depriving him of sleep and exposing him to repeated and prolonged questioning. Thus, his confession should have been excluded. Consequently, Mr. Lovato's convictions should be vacated and this case remanded for a new trial.

{¶ 28} In this assignment of error, Lovato claims that his confession was not voluntary because he was sleep-deprived and subjected to repeated and prolonged questioning. Lovato does not claim that his statements were given in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

{¶ 29} "In addressing a motion to suppress, the trial court assumes the role of the trier of fact. The court must determine the credibility of the witnesses and weigh the

evidence presented at the hearing. In reviewing the trial court's ruling, an appellate court must accept the findings of fact made by the trial court if they are supported by competent, credible evidence. However, 'the reviewing court must independently determine, as a matter of law, whether the facts meet the appropriate legal standard.'" (Citations omitted.) *State v. Griffin*, 2d Dist. Montgomery No. 25431, 2013-Ohio-3036, ¶ 15.

**{¶ 30}** Whether a statement was made voluntarily and whether an individual knowingly, voluntarily, and intelligently waived his or her *Miranda* rights are distinct issues. *State v. Eley*, 77 Ohio St.3d 174, 178, 672 N.E.2d 640 (1996); *State v. Kelly*, 2d Dist. Greene No. 2004-CA-20, 2005-Ohio-305. Regardless of whether *Miranda* warnings were required and given, a defendant's statement may have been given involuntarily and thus be subject to exclusion. *Kelly* at ¶ 11.

**{¶ 31}** A defendant's statements to police after a knowing, intelligent, and voluntarily waiver of the individual's *Miranda* rights are presumed to be voluntary. *Miranda*, supra. "The *Miranda* presumption applies to the conditions inherent in custodial interrogation that compel the suspect to confess. It does not extend to any actual coercion police might engage in, and the Due Process Clause continues to require an inquiry separate from custody considerations and compliance with *Miranda* regarding whether a suspect's will was overborne by the circumstances surrounding his confession." *State v. Porter*, 178 Ohio App.3d 304, 2008-Ohio-4627, 897 N.E.2d 1149, ¶ 14 (2d Dist.), citing *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

**{¶ 32}** "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and

prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), at paragraph two of the syllabus, overruled on other grounds, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978). *See also State v. Brewer*, 48 Ohio St.3d 50, 58, 549 N.E.2d 491 (1990); *State v. Beaty*, 2d Dist. Montgomery No. 24048, 2011-Ohio-5014, ¶ 16.

**{¶ 33}** The State has the burden to show by a preponderance of the evidence that a defendant's confession was voluntarily given. *State v. Melchior*, 56 Ohio St.2d 15, 381 N.E.2d 195 (1978).

**{¶ 34}** The evidence at the suppression hearing consisted of the testimony of Dayton Police Officer Michael Saylors and Detective Theresa Lawson. Officer Saylors testified that he (along with three other officers) went to the home of Lovato's sister in the late evening hours of January 16, 2006, to arrest Lovato on a rape complaint by T.M. Lovato was asleep in his bedroom. The officers handcuffed him without waking him, and then woke him to place him under arrest.

**{¶ 35}** When Lovato was being taken from his room, Lovato stated, "Is this about crackhead [T.]?" Saylors responded that it was. Lovato told the officer, "I paid [T.] $20 and we had consensual sex." The officer did not ask Lovato any questions and continued to walk Lovato to his cruiser. Once Lovato was in Officer Saylors's cruiser, the officer informed Lovato of his *Miranda* rights. Lovato stated that he understood them. Saylors then asked Lovato what had happened with T.M., and Lovato made statements. The conversation lasted approximately five minutes. After Lovato's statements, officers found

the general location of the crime, and Lovato was taken to the police department to be interviewed by a detective.

{¶ 36} Officer Saylors testified that Lovato did not ask for an attorney and did not say that he wanted to stop answering questions. Saylors stated that Lovato appeared sober, coherent, and alert, and he understood the English language. Neither Saylors nor any other officer promised Lovato anything to get him (Lovato) to make statements. Lovato remained awake during the ride to the police station.

{¶ 37} At the police station, Lovato was placed in a small interview room and his handcuffs were removed. Detective Lawson provided him with a glass of water and a cigarette, which he smoked. Lovato was left alone in the interview room for more than an hour while Lawson went to the scene of the rape and then returned.

{¶ 38} At 2:30 a.m. on January 17, Lawson read Lovato a preinterview form with his *Miranda* rights; Lovato followed along, indicated that he understood and wished to waive his rights, and signed the form. After waiving his rights, Lovato made statements to Detective Lawson regarding T.M., he wrote out a written statement, and he provided written answers to written questions. The question and answer page was completed at 3:40 a.m. Detective Lawson testified that Lovato was left alone to write his written statement. During the one hour and ten minutes, Lovato did not ask for an attorney or to stop the questioning. Detective Lawson stated that Lovato appeared sober and coherent and did not appear to be sleepy.

{¶ 39} After Detective Lawson finished this first interview, she spoke with Detective Olinger, who had been at the hospital interviewing T.M. Detective Lawson also

learned that there was another complainant, H.C. Detectives Lawson and Olinger went back into the interview room to question Lovato, with Detective Olinger leading the interview. Lovato was reminded that he had been provided his *Miranda* rights and that those rights still applied. Lovato admitted to being with H.C., but denied raping her. The detectives repeatedly told Lovato to tell the truth, and they confronted him with physical evidence that the women had been hurt. Eventually, Lovato answered a second set of written questions and provided a second statement. Lovato was left alone when he wrote the statement, and he was provided a break before then. The second interview was completed at approximately 5:20 a.m.

{¶ 40} Detective Lawson testified that Lovato was permitted to use the restroom, that he was provided water and cigarettes on several occasions, and that there were several breaks during the questioning. The detective told Lovato that, if he was tired, they could resume the interview in the morning. Lovato responded that he was "okay" and "somewhat of a night owl." Detective Lawson denied that she or Detective Olinger promised Lovato anything in exchange for Lovato's statements.

{¶ 41} We find no support for Lovato's assertion that his confession was involuntary. Lovato was advised of his *Miranda* rights by Officer Saylors and Detective Lawson, and he was again reminded of those rights before he was interviewed by Detective Olinger. Lovato waived his *Miranda* rights. The detectives questioned Lovato for several hours during the early morning hours of January 17, 2006. However, he was provided water and cigarettes on several occasions, and there were several breaks during the interview. Lovato was taken to use the restroom, and he was asked if he wanted to stop the

questioning due to fatigue; Lovato declined. Lovato was not handcuffed, and he was not promised anything to induce his statements. Detectives Olinger and Lawson repeatedly told Lovato that he needed to tell the truth, but there was no evidence that the detectives did anything that overbore Lovato's will. Lovato's claim that the trial court should have suppressed his confession as involuntary is without merit.

{¶ 42} Lovato's third assignment of error is overruled.

### IV. Intimidation of a Witness

{¶ 43} Lovato's fourth assignment of error states:

There was insufficient evidence to convict Mr. Lovato of intimidating a witness. Therefore, his conviction under R.C. 2921.04 should be vacated.

{¶ 44} Lovato was convicted of intimidating a witness, a first-degree misdemeanor, and the trial court sentenced him to six months in jail for that offense, to be served concurrently with his felony sentences. Lovato's conviction was based on evidence that he asked a cellmate, Kiesan Green, to contact H.C. and to tell her that she would be killed if she came to court. However, Green did not contact the witness or try to intimidate her. Lovato thus claims that there was insufficient evidence to support his conviction.

{¶ 45} We need not reach whether the evidence was sufficient to support Lovato's conviction, because we find the issue to be moot. "When a defendant convicted of a misdemeanor has not moved for a stay of his sentence, and has completed the sentence and paid any fine or costs, an appeal from the conviction is moot unless the defendant is subject to a collateral legal disability stemming from the conviction." *State v. Parrish*, 2d Dist. Montgomery Nos. 25050 & 25032, 2013-Ohio-305, ¶ 5. Lovato did not seek to stay the

execution of his misdemeanor sentence, and he has been imprisoned since 2007. Lovato has served the entirety of his six-month sentence.

{¶ 46} Lovato's assignment of error concerning his intimidation of a witness conviction is overruled as moot.

## V.  Conclusion

{¶ 47} The trial court's judgment will be affirmed.

. . . . . . . . . .

FAIN, J. and WELBAUM, J., concur.

Copies mailed to:

Andrew T. French
Carrie Wood
Hon. Dennis J. Langer