[Cite as *State v. Stewart*, 2017-Ohio-7840.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 16AP-884 |
| | | (C.P.C. No. 15CR-2605) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| D'Quante J. Stewart, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on September 26, 2017

**On Brief:** *Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee.

**On brief:** *Timothy Young*, Ohio Public Defender, and *Francisco E. Luttecke*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, D'Quante J. Stewart, from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which the jury returned verdicts finding him guilty of kidnapping and felonious assault with accompanying firearm specifications.

{¶ 2} On May 29, 2015, appellant was indicted for one count of kidnapping, in violation of R.C. 2905.01, one count of aggravated murder, in violation of R.C. 2903.01, one count of murder, in violation of R.C. 2903.01, one count of murder in violation of R.C. 2903.02, one count of attempted murder, in violation of R.C. 2923.02 and 2903.02, and one count of felonious assault, in violation of R.C. 2903.11. Each of the counts contained a firearm specification.

{¶ 3}    The matter came for trial before a jury beginning June 28, 2016.  At trial, plaintiff-appellee, State of Ohio, presented evidence indicating that on September 24, 2014, Columbus police officers were dispatched to the scene of a reported shooting near a While Castle restaurant located at the intersection of Fifth Avenue and Walters Street. Columbus Police Officer Greg Hudson arrived at the scene and was "flagged down by a female" who was "pointing over to White Castle's parking lot to a gentleman that was on the ground."  (Tr. Vol. I at 37.)  The officer pulled up and "talked to the gentleman on the ground.  His name was Ricky Searcy."  (Tr. Vol. I at 38.)  Searcy informed the officer he had been shot in the leg.  Searcy also told the officer he was in the area to meet a female named Sabrina Jackson.  Searcy "pointed across the street of where it all happened."  (Tr. Vol. I at 39.)

{¶ 4}    Shortly thereafter, Columbus Police Officer Don Olsen and his partner arrived at White Castle where they observed a "male victim that had been shot."  (Tr. Vol. I at 53.)   The officers then walked northbound on Walters Street where they "discovered a female victim right on the alley on the west side of the street."  (Tr. Vol. I at 55.)  The female, who had suffered a gunshot wound to the head, was dead at the time officers arrived.

{¶ 5}    Columbus Police Detective David Ramey was dispatched to the shooting scene in the early morning hours of September 25, 2014.  At trial, the detective identified photographs taken at the scene and testified that police investigators had collected a number of 9 mm shell casings.

{¶ 6}    Searcy, age 57, testified that he had been in a relationship with the female shooting victim, Jackson, for approximately five years.   In September 2014, the relationship was "off and on."  (Tr. Vol. I at 109.)

{¶ 7}    On September 24, 2014, Jackson called Searcy "to pick her up."  (Tr. Vol. I at 110.)  Searcy had not seen Jackson for several weeks.  Searcy drove to "the Short North area" of Columbus around 8:00 or 9:00 p.m. and met Jackson.  (Tr. Vol. I at 111.)  They bought some beer and went to a park, where they "engaged in sexual activity."   Searcy testified that "the police happened to ride upon us and caught us in the act * * * and told us we needed to find somewhere else to be."  (Tr. Vol. I at 113.)

{¶ 8}    As Searcy drove from the park, Jackson "looked down and happened to see some condoms" in the car.   (Tr. Vol. I at 113.)   Jackson "began arguing about the

condoms."   Searcy testified that he continued driving, and Jackson "started screaming and hollering, and finally we got over off of St. Clair and I pulled up to a stop sign, and she was so upset she jumped out of the car, which she had done * * * several times before." Searcy "got out of the car to try to get her back" inside.  Searcy and Jackson "tussled a little and she ended up walking off." (Tr. Vol. I at 114.)

{¶ 9}   Jackson kept walking until she was eventually out of Searcy's sight.  He returned to his car and "started circling the block" but was unable to locate her.  After 10 to 15 minutes, Jackson "started calling [Searcy's] phone from a private number."  (Tr. Vol. I at 115.)  Searcy answered the call, and Jackson "stated she left a bag of clothes in my car.  She wanted her bag.  And I told her that I would meet her at White Castle.  It was right around the corner." (Tr. Vol. I at 117.)

{¶ 10}  Searcy testified that he pulled up to the White Castle "and she is standing on the corner, and I tell her to get in, but she won't get in the car.  She is just standing there. I'm like, you know: It's getting late, come on, come on.  So I'm in the middle of a main highway, so I want to move my car because of the traffic."  (Tr. Vol. I at 117.)  Searcy then "circled around the block" and turned onto Walters Street, "the corner she is standing on." (Tr. Vol. I at 118.)  He parked and exited his vehicle as Jackson remained standing at the corner of Fifth Avenue and Walters Street.

{¶ 11} Searcy testified that he "was yelling: What is wrong? Will you get in the car? It's getting late. I have got to go to work.  And at this point I see several bodies move behind these bushes."  (Tr. Vol. I at 119.)  Searcy observed three or four individuals near the bushes that "seemed to be black males."  (Tr. Vol. I at 122.)  Searcy then testified: "I see a gun, I hear a guy said: 'You know what this is.'  And where I'm from, 'you know what this is' and you see a gun, you are going to get robbed or something bad starts to happen. So I started running towards [Jackson] and I hear multiple shots start, just boom, boom, boom, boom, boom, boom, boom, so I'm dodging and running."  (Tr. Vol. I at 119-20.) Searcy further testified that "the gunman said: 'He is a runner.' "  (Tr. Vol. I at 122.)

{¶ 12} Searcy was "running towards the White Castle because it's lit up" and he was "thinking people, that's probably [the] best option to get to the White Castle."  (Tr. Vol. I at 120.)  One of the bullets struck Searcy in his left leg, and he collapsed to the ground.  Searcy testified that he "just laid there and prayed.  When I opened my eyes I started crawling across the street towards the White Castle."  (Tr. Vol. I at 121.)

{¶ 13} After crawling across the street, Searcy dialed 911. A female walked up to Searcy and asked if he needed help. A short time later a police cruiser arrived, and Searcy began asking the officers if Jackson was alright. As a result of the shooting, Searcy underwent surgeries to his leg and remained in the hospital for approximately six to eight months following the incident.

{¶ 14} Tyriel Tatum, age 16, is a cousin of appellant. In 2014, Tatum resided with his grandmother near Walters Street. Tatum is an acquaintance of both Brandon Ogden and Marquan Woods.

{¶ 15} On the evening of September 24, 2014, Tatum, Ogden, and appellant were sitting in front of a house on Walters Street when Jackson walked up and asked to "use the phone so she can get her stuff back." (Tr. Vol. III at 160.) Ogden allowed Jackson to use his phone. A short time later, Jackson, Tatum, appellant, Ogden, and Woods began walking up the street to the intersection of Fifth Avenue and Walters Street. Jackson was talking on the phone. She then gave the phone back to Ogden. They stood there and waited, and then "the car pulled up." (Tr. Vol. III at 163.) Tatum described the car as a blue Cadillac. Tatum, appellant, Ogden, and Woods "went over by the bushes." Tatum testified that he "didn't know what was about to happen." (Tr. Vol. III at 163.) Appellant and Ogden both had weapons that evening.

{¶ 16} A man "got out [of the vehicle], and the lady started walking up to him, and then he started hitting her." Ogden "tried to stop it then." Woods "was just standing there." Tatum testified that the "[n]ext thing you know there was shots going off." (Tr. Vol. III at 164.) When asked who fired the shots, Tatum responded: "I don't know. I was behind the bushes. I heard the shots, but I know that [Ogden] had a gun and D'Quante had a gun." (Tr. Vol. III at 164-65.) Tatum stated that Ogden and Woods were not shooting.

{¶ 17} The following colloquy then occurred between the prosecutor and Tatum during direct examination:

> Q. Could you see whether or not D'Quante was shooting?
>
> A. No, ma'am, but there is no way around it.
>
> Q. Could you tell who was shooting by who was there and who you knew was not shooting?

A. Yes, ma'am.

Q. Who was shooting?

A. It had to be D'Quante.

(Tr. Vol. III at 165.)

{¶ 18} Tatum heard seven or eight shots, describing the sequence as "multiple" shots, and "[t]hen it was just one" shot. After the shooting stopped, Tatum, who "was just standing there, * * * ran" from the scene. (Tr. Vol. III at 166.)

{¶ 19} Columbus Police Detective James Howe, qualified as an expert in cell phone forensics, performed cell phone and cell phone tower analysis as part of the investigation into the shooting. At trial, the parties stipulated as to appellant's cell phone number. Detective Howe testified that appellant's phone was in the general location of the crime scene during the events at issue. Specifically, the detective stated: "During the timeframe of the incident that I was given, that cell phone never really left that general location of the homicide scene. It connected to a couple of different towers right within that area of where it's located." (Tr. Vol. III at 198-99.)

{¶ 20} At trial, the parties also stipulated as to the cell phone numbers of Searcy and Ogden. Detective Howe identified a series of calls made at approximately 1:00 a.m. on September 25, 2014; he noted that calls were made from Ogden's cell phone number to Searcy's cell phone number, as well as calls made from Searcy's phone to Ogden's phone.

{¶ 21} Woods, age 22, is acquainted with both Ogden and Tatum. Woods described appellant as his "godbrother." (Tr. Vol. III at 211.) Woods and appellant "would hang close when we was teenagers and high school." (Tr. Vol. III at 212.)

{¶ 22} On September 24, 2014, appellant phoned Woods and asked him to "come out there and just chill." (Tr. Vol. III at 218.) Woods drove to Walters Street, and met up with appellant, Tatum, and Ogden. Shortly after he arrived, Woods observed someone attempting to force a female into the back seat of a vehicle. He subsequently learned that the female was Jackson, and the other individual was Searcy.

{¶ 23} Woods later observed Jackson walking along Walters Street, and she was "crying." Woods stated that "[w]e stopped her to see what was wrong with her." Jackson told them that "she was trying to get away from [Searcy]. He was stopping her from going

to see her mom in the hospital and she just wanted to get her stuff. She was like no shoes, didn't have a shirt up under, and she wanted us to get her stuff back." (Tr. Vol. III at 222.) Jackson informed them that her items were in Searcy's vehicle.

{¶ 24} Woods, Ogden, and appellant discussed with Jackson a plan to help her retrieve her items. Woods testified: "She would use a phone, she would use [Ogden's] phone to call [Searcy], try to get him up." (Tr. Vol. III at 222.) Jackson made two calls on Ogden's phone "[t]o try to get [Searcy] to come on Walters so he could park." (Tr. Vol. III at 223.) Woods explained that the plan was to attempt to get Searcy to exit his car "[b]ecause if he didn't get out of the car he was going to pull off with her stuff again. So we figured if we get him out of the car, it's four of us, he wouldn't be able to stop us from getting her stuff out of the car." Woods further explained: "[I]f [Searcy] was in the car he would pull off if he seen four male individuals coming up to his car to help her. So we just wanted to draw him out of the vehicle." (Tr. Vol. III at 224.)

{¶ 25} The first time Searcy drove by "[h]e didn't stop." (Tr. Vol. III at 225.) Searcy eventually parked on Walters Street. At the time, Woods, Ogden, appellant, and Tatum were "hiding behind a bush." Searcy exited his vehicle and "was walking toward [Jackson] trying to get her to snatch her back into the car." (Tr. Vol. III at 226.) According to Woods, they planned to "[r]un to his car and when he sees us he wouldn't be able to stop us, we would be able to get in his car and get her stuff for her." (Tr. Vol. III at 226-27.)

{¶ 26} Woods began to run toward Searcy's vehicle, but then "heard gunshots." Woods "looked back and * * * seen [Searcy] on the ground. Woods heard "[m]ultiple" gunshots, and then one single shot. (Tr. Vol. III at 228.) During the incident, he also heard Jackson scream. After hearing the shots, Woods ran to his car and drove home. Woods "didn't know" who fired the shots. (Tr. Vol. III at 232.) Police detectives subsequently contacted Woods and he spoke with them about the incident.

{¶ 27} As part of the investigation, Erica Pattie, a firearms examiner with the Columbus Police Crime Lab, "was asked to compare eight spent cartridge cases * * * to determine whether or not they came from the same firearm, and * * * to determine the caliber of the spent bullet." (Tr. Vol. III at 252.) Pattie testified that each of the cartridges came from a "9mm Luger." (Tr. Vol. III at 255.) She concluded that "these eight cartridge cases were all fired by the same firearm." (Tr. Vol. III at 256.) She also noted that one of

the bullets was "found * * * to be a .38-caliber bullet."   Pattie testified that ".38-caliber is a general family, and 9mm falls within that family."  (Tr. Vol. III at 261.)  She was unable to determine if the .38-caliber bullet was fired from the same weapon that ejected the 9 mm casings.

{¶ 28} On September 25, 2014, Dr. John A. Daniels, a deputy coroner with the Franklin County Coroner's Office, performed an autopsy of Jackson.  He testified that the cause of death was listed as a gunshot wound to the head.  The entrance wound was to the "right occipital region" or back of the skull.  (Tr. Vol. IV at 281.)  The bullet wound exited "under the jaw."  (Tr. Vol. IV at 283.)  The course of the bullet was "from back to front downward and somewhat from left to right."  (Tr. Vol. IV at 284-85.)

{¶ 29} Following deliberations, the jury returned verdicts finding appellant guilty of kidnapping and felonious assault, and not guilty of aggravated murder, murder, or attempted murder.  By judgment entry filed August 10, 2016, the trial court sentenced appellant to 5 years incarceration as to Count 1 (kidnapping), 8 years incarceration as to Count 7 (felonious assault), to be served consecutive to each other and consecutive to two firearm specifications, for a total sentence of 19 years.

{¶ 30} On appeal, appellant sets forth the following two assignments of error for this court's review:

> [I.] D'Quante Stewart's conviction for kidnapping was not supported by sufficient evidence in violation of his right to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the Ohio Constitution.
>
> [II.] The trial court erred in violation of D'Quante Stewart's rights under the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, Article I, Section 10 of the Ohio Constitution, and R.C. 2941.25, when it failed to merge for sentencing offenses of similar import, which arose from the same conduct, and were not committed separately or with a separate animus.

{¶ 31} Under his first assignment of error, appellant contends his conviction for kidnapping was not supported by sufficient evidence.  Specifically, appellant argues the state presented no evidence that he acted by deception to remove Searcy from the place

where he was found, and that there was insufficient evidence that he was complicit in the removal of Searcy.

{¶ 32} In considering a challenge as to the sufficiency of the evidence, an appellate court "construes the evidence in favor of the prosecution and determines whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt." *State v. Hill,* 10th Dist. No. 07AP-889, 2008-Ohio-4257, ¶ 41. In conducting such review, "an appellate court does not engage in a determination of witness credibility, rather it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime." *Id.*

{¶ 33} R.C. 2905.01(A) defines the offense of kidnapping, and states in part:

> No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
>
> * * *
>
> (2) To facilitate the commission of any felony or flight thereafter;
>
> (3) To terrorize, or to inflict serious physical harm on the victim or another.

{¶ 34} In the present case, the trial court instructed the jury that appellant could be convicted as a principal offender or as a complicitor. R.C. 2923.03(A) states as follows:

> No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
>
> (1) Solicit or procure another to commit the offense;
>
> (2) Aid or abet another in committing the offense;
>
> (3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;
>
> (4) Cause an innocent or irresponsible person to commit the offense.

{¶ 35} In challenging the sufficiency of the evidence as to his kidnapping conviction, appellant contends Searcy testified at trial that it was his idea to go to White

Castle, and his choice to exit his car to persuade Jackson to come with him. Appellant maintains that Searcy did not speak or interact with anyone besides Jackson that night, and that Searcy's testimony contained only evidence that he acted of his own volition.

{¶ 36} In response, the state argues there was sufficient evidence, including the testimony of Tatum and Woods, from which the jury could have concluded that appellant conspired with the other individuals and utilized deception to lure Searcy from his vehicle for the purpose of robbing him or inflicting harm if he failed to comply. We agree.

{¶ 37} As noted under the facts, Woods testified as to a plan that he, appellant, and Ogden discussed with Jackson to retrieve her items from Searcy's vehicle. Jackson was to call Searcy on Ogden's phone; the purpose of the call was to "try to get him to come on Walters so he could park and try to get her back in his car." (Tr. Vol. III at 223.) According to Woods, their intent was to get Searcy to park and exit the vehicle. When asked why they wanted him out of the car, Woods testified: "[b]ecause if he didn't get out of the car he was going to pull off with her stuff again. So we figured if we get him out of the car, it's four of us, he wouldn't be able to stop us from getting her stuff out of the car." As part of the deception, Woods, Ogden, appellant, and Tatum hid behind bushes as Searcy approached. As to their actions, Woods explained: "[I]f [Searcy] was in the car he would pull off if he seen four male individuals coming up to his car to help her. So we just wanted to draw him out of the vehicle." (Tr. Vol. III at 224.) Woods noted that Searcy initially drove by several times, but Jackson did not get inside the vehicle because he did not stop the vehicle according to the plan. When asked whether "the whole point [was] to get him to park," Woods responded: "Yes." (Tr. Vol. III at 225.) Searcy's testimony also indicated that Jackson refused to get inside the vehicle as he drove by, thereby requiring him to park and leave the vehicle.

{¶ 38} After Searcy parked and exited the vehicle, the four men emerged from the bushes and approached Searcy. Searcy observed that one of the men had a gun, and one of the men said to him, "[y]ou know what this is," which Searcy interpreted to mean "you are going to get robbed or something bad." Searcy heard one of the individuals state: "He is a runner." As noted by the state, the group did not wait or attempt to retrieve Jackson's items. Rather, as Searcy attempted to run, the gunman immediately began firing.

{¶ 39} Here, construing the evidence most strongly in favor of the state, the prosecution presented evidence upon which a jury could reasonably conclude that

appellant conspired with others to employ deception to lure Searcy from his vehicle for the purpose of committing a felony or to inflict serious physical harm. Accordingly, the state presented sufficient evidence to support the elements of the offense of kidnapping beyond a reasonable doubt. Appellant's first assignment of error is overruled.

{¶ 40} Under the second assignment of error, appellant asserts the trial court erred in failing to merge for purposes of sentencing his convictions for kidnapping and felonious assault. Appellant maintains the offenses were of similar import, and were committed at the same time and with the same animus.

{¶ 41} R.C. 2941.25, Ohio's multiple count statute, states as follows:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where [the] conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 42} In reviewing a trial court's merger determination, an appellate court employs a de novo standard of review. *State v. Williams,* 134 Ohio St.3d 482, 2012-Ohi0-5699, ¶ 28.

{¶ 43} In *State v. Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, paragraph one of the syllabus, the Supreme Court of Ohio held that courts must evaluate "the conduct, the animus, and the import" in determining whether offenses are allied offenses of similar import. Pursuant to R.C. 2941.25(B), "a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus." *Id.* at paragraph three of the syllabus. Further, "[t]wo or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at paragraph two of the syllabus.

{¶ 44} We have previously noted the elements of kidnapping in addressing appellant's first assignment of error. The offense of felonious assault is defined under R.C. 2903.11(A), and provides in part that "[n]o person shall knowingly do either of the following: (1) Cause serious physical harm to another * * *; (2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

{¶ 45} On review, we find no error by the trial court in not merging the offenses of kidnapping and felonious assault. Here, the act of luring Searcy to the area of White Castle by means of deception constituted conduct separate from the act of inflicting serious physical harm to Searcy by shooting him after he arrived and exited the vehicle. *See, e.g., State v. Lovato,* 2d Dist. No. 25683, 2014-Ohio-2311, ¶ 21 (although felonious assault occurred while victim was restrained by defendant, it was a separate act from kidnapping by deception; the kidnapping by deception began when defendant deceived victim into giving him a ride to his home, and victim was not assaulted while she was driving defendant to his residence); *State v. Griffin,* 10th Dist. No. 10AP-902, 2011-Ohio-4250, ¶ 87 (trial court did not err in failing to merge felonious assault conviction with kidnapping conviction; appellant committed felonious assault by punching and stabbing victim which was separate and distinct conduct from initial restraint of victim in van). Furthermore, we agree with the state that the harm that resulted from the felonious assault was separate and identifiable from the harm caused by the kidnapping offense.

{¶ 46} Accordingly, the trial court did not err in finding the offenses are not subject to merger. Appellant's second assignment of error is overruled.

{¶ 47} Based on the foregoing, appellant's two assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

SADLER and BRUNNER, JJ., concur.

_____