[Cite as *State v. Villegas*, 2017-Ohio-2887.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

STATE OF OHIO                          :
                                                   :
    Plaintiff-Appellant            :       Appellate Case No. 27234
                                                   :
v.                                              :       Trial Court Case No. 2016-CR-0336/4
                                                   :
JASON VILLEGAS                      :       (Criminal Appeal from
                                                   :        Common Pleas Court)
    Defendant-Appellee         :
                                                   :

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ____19th____ day of ____May____, 2017.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL J. SCARPELLI, Atty. Reg. No. 0093662, 301 West Third Street, 5th Floor, Dayton, Ohio 45402
    Attorney for Plaintiff-Appellant

PAUL E. WAGNER, Atty. Reg. No. 0067647, Hanes Law Group, Ltd., 111 N. Bridge St., P.O. Box 315, Gettysburg, Ohio 45328
    Attorney for Defendant-Appellee

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} The State of Ohio appeals from an order of the Montgomery County Court of Common Pleas, which sustained in part the motion of Jason Villegas to suppress evidence.  The State contends the trial court erred in suppressing all of the statements Villegas made to a detective at the Huber Heights police station.  Although Villegas

initially invoked his right to remain silent, the State argues that Villegas subsequently initiated conversation with the detective by asking questions about the case and manifested an intent to waive his right to remain silent. For the following reasons, the trial court's judgment will be affirmed.

## I. Background and Procedural History

{¶ 2} The record reflects that Villegas was charged with 73 counts of forgery and 13 counts of identity fraud for his role, along with three other people, in allegedly using stolen or fraudulent credit cards. When Villegas was arrested outside of a Huber Heights shopping center, the police found dozens of counterfeit or cloned credit cards in the car he shared with his co-defendants. Villegas and his co-defendants were transported to the police department, where they were initially taken to holding cells on the first floor of the building.

{¶ 3} Officer Robert Bluma and Detective James Gebhart brought Villegas upstairs to an interview room in the detective section of the police department, and Gebhart read Villegas his *Miranda* rights using a pre-interview form. Villegas declined to speak to the detective, and he did not initial or sign the form. Gebhart asked no additional questions, and Villegas did not request an attorney. At that point, Bluma and Gebhart escorted Villegas back downstairs to a holding cell.

{¶ 4} As they approached the holding cell, Villegas asked the detective what the "process" or "procedure" would be from there. Gebhart responded that Villegas did not have a bond and would remain detained. The detective stated that he would speak with the prosecutor about the case the next day, and if the prosecutor approved the charges, then there would be some court proceedings. Gebhart testified that he "may have told"

Villegas that his bond would be higher because Villegas was from out-of-state.

{¶ 5} After Gebhart answered the procedural question, Villegas asked, "What if I sign your paper?" Gebhart understood Villegas to be referring to the waiver of rights form. Gebhart responded that it would not change the process, but that it would give Villegas an opportunity to tell his side of the story, which could make things better by minimizing or mitigating his involvement. Villegas then spoke to the detective and made potentially incriminating statements before again exercising his right to remain silent.[1]

{¶ 6} Villegas subsequently filed a motion to suppress and an amended motion to suppress. The trial court held evidentiary hearings on the motions in April and May 2016, during which Gebhart and other law enforcement officers involved in the case testified. Villegas did not testify.

{¶ 7} Based on the testimony presented, the trial court granted Villegas's motion to suppress. The trial court summarized its factual findings as to what had occurred, stating: "During the walk, Villegas reinitiated conversation, asking about the procedure and making a statement that the vehicle was a rental. Det. Gebhart then asked Villegas a series of questions and informed Villegas he had a chance to make it better before Villegas again refused to answer any other questions. No further questions were asked

---

[1] Gebhart testified on direct examination: "[Villegas] made the statement that the car was his or he had rented the car and all that stuff was in his car. I then made the statement to him that what I was looking at was counterfeit credit cards. And I said — and there were a lot of them. He said, 'Yes, I know.' " Gebhart further testified that he said to Villegas, "You're the one that knows at this point, am I going to find your face on camera in any of these stores using these cards?" The detective indicated that Villegas responded that he would not. When Gebhart then asked Villegas, "Oh, so you're just the driver," Villegas declined to answer and said he did not want to talk anymore. (Amended Supp. Tr. at 111-112).

of Villegas." Citing *State v. Kerby*, 162 Ohio App.3d 353, 2005-Ohio-3734, 833 N.E.2d 757 (2d Dist.), the court suppressed all of the statements Villegas made to Gebhart, finding that the detective did not "scrupulously honor" Villegas's right to remain silent. The trial court declined, however, to suppress evidence found in the vehicle in which Villegas was a passenger, concluding that he lacked standing to challenge a search of the vehicle.

{¶ 8} Pursuant to R.C. 2945.67(A) and Crim.R. 12(K), the State appeals from the trial court's suppression ruling.

## II. Waiver of Right to Remain Silent

{¶ 9} In its sole assignment of error, the State claims that Villegas made "unprompted" statements, that he freely reinitiated conversation with the detective, and that he knowingly, intelligently, and voluntarily waived his right to remain silent after initially invoking it. The State argues that the police "scrupulously honored" Villegas's *Miranda* rights by not interrogating him when he initially indicated that he did not want to talk and, after Villegas reinitiated the conversation, by again ceasing any questioning after Villegas stated that he no longer wished to talk.

{¶ 10} In response, Villegas contends the trial court correctly relied on *Kerby* to find that Gebhart did not "scrupulously honor" his right to remain silent. Villegas asserts that his discreet question about the process or procedure going forward did not evince a desire for generalized discussion about the case. He argues that Gebhart improperly used that question to entice him to talk by making statements about telling his side of the story, making things better, and minimizing his involvement. Villegas asserts that these comments by Gebhart were the functional equivalent of unlawful interrogation. Finally,

Villegas claims that, even if he did initiate conversation with the detective, the record does not show a knowing, intelligent, and voluntary waiver of his rights.

{¶ 11} When ruling on a motion to suppress, " 'the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses.' " *State v. Hopfer*, 112 Ohio App.3d 521, 548, 679 N.E.2d 321 (2d Dist.1996), quoting *State v. Venham*, 96 Ohio App.3d 649, 653, 645 N.E.2d 831 (4th Dist.1994). We must accept the trial court's findings of fact if they are supported by competent, credible evidence in the record. *State v. Isaac*, 2d Dist. Montgomery No. 20662, 2005-Ohio-3733, ¶ 8, citing *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994). Accepting those facts as true, we then must determine as a matter of law, without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied. *Id.*

{¶ 12} Gebhart's cross-examination testimony makes clear that when Gebhart concluded his explanation of the process going forward, Villegas asked what would happen if he signed "your paper," which Gebhart understood to mean the waiver of rights form. In response to that question, Gebhart made the statements to which Villegas objects about Villegas's then having an opportunity to make things better by telling his side of the story and minimizing or mitigating his involvement. It is these statements by Gebhart that Villegas contends were the functional equivalent of unlawful interrogation and that prompted him to make his own incriminating statements.

{¶ 13} Under the Fifth Amendment to the United States Constitution, no person shall be compelled to be a witness against himself or herself. In order to ensure that this right is protected, statements resulting from custodial interrogations are admissible only

after a showing that the procedural safeguards described in *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), have been followed. *State v. Earnest*, 2d Dist. Montgomery No. 26646, 2015-Ohio-3913, ¶ 21. To counteract the coercive pressure of custodial interrogations, police officers must warn a suspect, prior to questioning, that he or she has a right to remain silent and a right to the presence of an attorney. *Maryland v. Shatzer*, 559 U.S. 98, 103-104, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010), citing *Miranda*. "The opportunity to exercise these rights exists throughout the interrogation, and thus, the interrogation must cease when the defendant exercises his 'right to cut off questioning,' which must be scrupulously honored." *State v. Miller*, 7th Dist. Mahoning No. 13 MA 12, 2014-Ohio-2936, ¶ 41, citing *Miranda* at 473-474 and *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (recognizing that a defendant's right to "cut off questioning" must be "scrupulously honored"). *See Shatzer* at 104 ("After the warnings are given, if the suspect indicates that he wishes to remain silent, the interrogation must cease. Similarly, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present.").

{¶ 14} A defendant may waive his or her *Miranda* rights. As stated by the Ohio Supreme Court:

> If custodial interrogation continues in the absence of an attorney after a police officer advises a suspect of his rights, the government bears "a heavy burden" to demonstrate by a preponderance of the evidence that the suspect "knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel" before speaking to the police. * * * A court may not presume a valid waiver either from the

suspect's silence after warnings are given or from the fact that the suspect eventually confessed. Rather, the record must show " 'that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.' " If the state does not satisfy its burden, "no evidence obtained as a result of interrogation can be used."

(Citations omitted.) *State v. Barker*, Ohio Sup. Ct. Slip Opinion No. 2016-Ohio-2708.

{¶ 15} An individual may waive his or her *Miranda* rights after previously invoking them. But, it is well established that, once a defendant in custody invokes his *Miranda* rights, no further interrogation is permitted unless the defendant initiates further conversation with police. *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 51, citing *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Oregon v. Bradshaw*, 462 U.S. 1039, 1043-1044, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (plurality opinion); *see also Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed. 2d 313.

{¶ 16} A defendant "initiates" conversation when his statements show "a willingness and a desire" for further discussion about the crime. *Gapen* at ¶ 51 ("the police did not improperly obtain Gapen's confession during questioning, because Gapen initiated further discussion about the crime after invoking his *Miranda* rights"); *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 123; *see Bradshaw* at 1045-1046. Some inquiries, however, "such as a request for a drink of water or a request to use a telephone" are "so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." *Id.* at 1045. Even when further conversation is initiated

by the defendant, if re-interrogation follows then the prosecution bears the burden to show a knowing, intelligent, and voluntary waiver of the defendant's Fifth Amendment rights under the totality of the circumstances.   *Id.* at 1044, 1046.

{¶ 17} In *Bradshaw*, the defendant asserted his right to counsel and his right to remain silent, and police stopped questioning him.   While being transported to jail, the defendant then asked, "Well, what is going to happen to me now?"   *Id.* at 1045.   A plurality of the United States Supreme Court reasoned that this question was sufficient to constitute initiation of generalized discussion about the case:

> Although ambiguous, the respondent's question in this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship.   It could reasonably have been interpreted by the officer as relating generally to the investigation. * * *

*Id.* at 1045-1046.

{¶ 18} We note that, as a plurality opinion, *Bradshaw* is not binding precedent, *see Texas v. Brown*, 460 U.S. 730, 737, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), and we question whether the generic question, "What is the process from here?" reflects anything more than curiosity about post-interview booking and other custodial procedures.   As noted by Justice Powell in his concurring opinion in *Bradshaw*, the justices had varying interpretations of the meaning of "initiation" in *Edwards*, with Justice Marshall (who authored the four-member dissenting opinion) reading *Edwards* as requiring that the communication be "about the subject matter of the criminal investigation," whereas

Justice Rehnquist (who authored the plurality opinion) would require only that the suspect "evinc[e] a willingness and a desire for a generalized discussion about the investigation." *Bradshaw* at 1048 (Powell, J., concurring).

{¶ 19} Although not directly addressing the standard for "initiation," the Ohio Supreme Court has twice stated that a defendant initiated further conversations with the police when he " 'evinced a willingness and a desire' to talk further about the crime." *Powell* at ¶ 123, quoting *Bradshaw* at 1045-1046; *Gapen* at ¶ 51. *But see State v. Jackson*, 57 Ohio St.3d 29, 35, 565 N.E.2d 549 (1991) ("The evidence supports the conclusion that Jackson 'evinced a willingness and a desire for a generalized discussion about the investigation.' "). In both *Powell* and *Gapen*, the Ohio Supreme Court implied that, in order to initiate further conversations, the defendant's statements needed to be directed to the subject of the criminal investigation.

{¶ 20} In the present case, after invoking his right to remain silent, Villegas asked Gebhart what the "process" or "procedure" would be going forward. Although a similar question as in *Bradshaw*, we do not find that this question by Villegas was sufficient to show a willingness and a desire to discuss the subject of his criminal case with the police. Rather, it expressed a desire to know what the process would be from then on out.

{¶ 21} However, even if Villegas's initial question constituted an initiation of conversation, we must determine whether "a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Edwards*, 451 U.S. at 486, fn. 9; *Gapen* at ¶ 52. The fact that Villegas

reopened the dialogue with Gebhart is a relevant, but not dispositive, consideration. *See Gapen* at ¶ 52; *Edwards*, 451 U.S. at 486, fn. 9*; Bradshaw* at 1046.

{¶ 22} In *Bradshaw*, the police officer's response to the defendant's question, "Well, what's going to happen to me now?" was to remind the defendant of the crux of his *Miranda* rights.  The officer said, "You do not have to talk to me.  You have requested an attorney and I don't want you talking to me unless you so desire because anything you say – because – since you have requested an attorney, you know, it has to be at your own free will."  *Bradshaw* at 1042.  Bradshaw had responded that he understood, and a discussion followed.  A majority of the Supreme Court agreed that Bradshaw had knowingly and intelligently waived his right to counsel.  *Id.* at 1046-47 (plurality), 1051 (Powell, J., concurring).

{¶ 23} In *Jackson*, the Ohio Supreme Court concluded that a defendant knowingly and intelligently waived his *Miranda* rights when, two days after invoking his right to an attorney, he sent for a detective (who was unaware that Jackson had twice previously invoked his right to counsel) and made incriminating statements.  Jackson had contacted the detective, because he was worried about his mother's health and how his mother would be told of his arrest.  Before speaking with Jackson, the detective advised Jackson of his *Miranda* rights; Jackson stated that he was willing to talk to the officer, but "did not want to sign the form or anything else."  The Ohio Supreme Court stated:

> In this case, Jackson clearly understood his right not to talk to the police
> and exercised that right on September 5 and 6.  However, on September
> 7, Jackson freely chose to send for Newkirk [the detective] and start a
> conversation with him.  Newkirk again advised Jackson fully of his rights,

and Jackson said he understood them. Newkirk did not threaten or force Jackson to make any statement. Jackson wanted to talk about his mother, and he was willing to talk about the murder investigation. * * * Jackson knowingly and intelligently waived his right to have counsel present and decided to talk freely with Newkirk. Since the waiver issue is factual, we defer " * * * to the judgment of the trial court that has had the benefit of hearing the evidence and assessing the weight and credibility of testimony." (Citation omitted.) *Jackson* at 35.

{¶ 24} Here, immediately after Gebhart explained the procedures going forward, Villegas asked, "What *if* I sign your paper?" (Emphasis added.) Villegas's question simply asked the detective about the consequences of signing the waiver of rights form; it did not express a desire to waive his Fifth Amendment rights. Gebhart responded that if Villegas signed the form, he would have an opportunity to tell his side of the story and help himself by minimizing or mitigating his involvement. Gebhart's answer went beyond answering that the process would be the same, but that Villagas would be waiving his rights. Instead, it encouraged Villegas to waive his constitutional rights by emphasizing that Villegas could help himself by talking with the police. Unlike *Bradshaw* or *Jackson*, the detective said nothing to remind Villegas of his *Miranda* rights or to ensure that Villegas intended to waive those rights.

{¶ 25} In concluding that the police did not scrupulously honor Villegas's rights, the trial court relied on *State v. Kerby*, 162 Ohio App.3d 353, 2005-Ohio-3734, 833 N.E.2d 757 (2d Dist.). In *Kerby*, the defendant and two others were arrested for a robbery and shooting. Kerby was brought to police headquarters, where officers advised him of his

*Miranda* rights. Kerby acknowledged and waived his rights, and an interview commenced. Shortly thereafter, Kerby invoked his right to remain silent, the interview was terminated, and Kerby was returned to his holding cell. Several hours later, the police interview resumed, ostensibly at Kerby's request to speak to the officers, and after again being informed of and waiving his *Miranda* rights, Kerby made incriminating statements. Kerby later moved to suppress the statements he made. On appeal from the denial of his motion, Kerby claimed that "the police failed to scrupulously honor his right to cut off questioning" and therefore his statements should have been suppressed.

{¶ 26} We held that the trial court erred in denying Kerby's motion to suppress his statements to the police. We emphasized that, "in *Michigan v. Mosley, supra*, the Supreme Court held that the admissibility of incriminating statements obtained after a person in police custody has initially decided to remain silent and not answer questions depends upon whether his or her right to cut off questioning was 'scrupulously honored' by police." *Kerby* at ¶ 86, quoting *Mosley*, 423 U.S. at 104. We stated that, "[i]n our view, that means that police ought not resume the interrogation, either directly or indirectly, by encouraging the suspect to tell his side of the story in order to help himself, which is the functional equivalent of interrogation." *Id.* at ¶ 87, citing *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

{¶ 27} Gebhart's answer to the question about signing the waiver of rights form was the functional equivalent of unlawful interrogation, and Villegas proceeded to discuss details of the criminal offense for which he was in custody and for which he had shortly before invoked his right to remain silent. That fact that Villegas then made statements regarding the criminal offense did not, alone, evince a knowing, intelligent, and voluntary

waiver of his *Miranda* rights, and we find nothing in these circumstances to indicate that Villegas knowingly, intelligently, and voluntarily waived his *Miranda* rights when he spoke with Gebhart while being returned to his holding cell.

{¶ 28} We recognize that the "[p]olice are not required to readminister *Miranda* warnings to a suspect when a relatively short period of time has elapsed since the initial warnings." *Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 119. However, the issue is not whether Villegas was aware of his *Miranda* rights. Rather, the question was whether he knowingly, intelligently, and voluntarily waived those rights while he was being escorted back downstairs to a jail cell. Even assuming that Villegas initiated the conversation with Gebhart, the record does not reflect that Villegas knowingly, intelligently, and voluntarily waived his rights prior to questioning by the detective.

{¶ 29} The State's assignment of error is overruled.

### III. Conclusion

{¶ 30} The trial court's judgment will be affirmed.

. . . . . . . . . . . .

DONOVAN, J., concurs.

HALL, P.J., dissenting:

{¶ 31} In my opinion the trial court erred in suppressing statements Villegas made to the detective following his arrest. Although the appellee initially invoked his right to remain silent in the interview room, he voluntarily initiated case-related conversation with the detective shortly thereafter while being escorted to a jail cell. In response to the appellee's questions, the detective made direct and accurate responses that led to the

appellee making potentially incriminating statements. Those statements by the appellee are not subject to suppression because he initiated conversation with the detective and knowingly and intelligently waived his right to remain silent. I would reverse the judgment of the trial court and, therefore, dissent.

{¶ 32} At the evidentiary hearing on the motion to suppress conducted in April and May 2016, the only witnesses were Gebhart and other law-enforcement officers. Notably, Villegas did not testify or otherwise dispute the officers' factual rendition. After Villegas declined to sign a rights-waiver form and declined to speak to Gebhart, the detective asked no additional questions, and Villegas did not request an attorney. Gebhart escorted Villegas to a jail cell. The following is the testimony relevant to what happened next:

Q. Okay. Once he decided he did not want to speak with you, what was your next step with him?

A. Take him back to the jail area and move onto the next individual.

Q. Okay. At any point in transporting him back to the jail area, was there any conversation between Mr. Villegas and you?

A. Yes.

Q. Okay. And who initiated that?

A. Mr. Villegas.

Q. And how did he initiate that?

A. We got to the door to the entrance of the jail and I started to open the door. He asked me what the procedure was from here.

Q. Okay. Did you answer that question?

A. Yes, I did.

Q. Okay. Did you—at that point did he ask anything else?

A. He made the statement that the car was his or he had rented the car and all that stuff was in his car. I then made the statement to him that what I was looking at was counterfeit credit cards. And I said—and there were a lot of them. He said, "Yes, I know."

Q. Okay. Did he ask any follow-up questions about that?

A. Yes, I did.

Q. I'm sorry. Did you ask any follow-up questions about that?

A. Yes. In kind of a statement form question, I put it to him, "You're the one that knows at this point, am I going to find your face on camera in any of these stores using these cards?"

Q. Okay. Did he respond to you?

A. Yes.

Q. And what'd he say?

A. He said no I would not.

Q. Okay. Were there any further questions asked?

A. Then I made the statement, "Oh, so you're just the driver?" At which point he declined to answer and said he didn't want to talk anymore.

Q. Okay. Once he indicated he didn't want to talk, did you ask any further questions of him?

A. No.

(Amended Supp. Tr. at 111-112).

{¶ 33} On cross examination, Gebhart elaborated on and clarified his interaction

with Villegas outside of the jail cell. He engaged in the following exchange with defense counsel:

Q. Okay. [You] [t]ake him back downstairs to the jail area, correct?

A. Correct.

Q. Okay. And at that point his question to you was, "What is the process from here?" And you indicated in your report that you quote, unquote, I explain [sic] the process of presenting the case, et cetera. You indicated to him he's detained and would remain detained, correct?

A. That's correct.

Q. You indicated that he did not have a bond?

A. Correct.

Q. And that sometime in the future a judge would set a bond?

A. Probably.

Q. And that you would have to get an approval at some point in the future to get your case approved by a prosecutor?

A. I think that I said the next day.

Q. Okay. And that if the prosecutor approved the charges that then there would be some court proceedings, right?

A. Yes.

Q. An arraignment and what have you? Did you tell him anything else about the process?

A. Not that I recall.

Q. Did you tell him that, well, the fact that you're from out of state the

bond's going to be higher?

A. I may have told him that.

Q. Okay. And you know from being 23 years as a detective, any time you get the guys talking, that's a positive for you, correct?

A. Sure.

Q. Because you might then be able to get them to talk, correct? At the conclusion of explaining the process, it would be a correct statement that that was when [Villegas] said, "What if I sign your paper," correct?

A. Yes.

Q. And he was referring to the paper waiving his rights to talk to you?

A. Correct.

Q. And what did you say at that point?

A. I told him that it really wouldn't change the process, but it would give him his opportunity to tell his side of the stor[y].

Q. Well, in your report it says that you would give him the opportunity to minimize or mitigate his involvement?

A. Yeah.

Q. In other words, he now has a chance to make it better, right?

A. Right now I don't have his story—

Q. Right.

A. –at that point.

Q. Here's a chance to make it better for himself, that was your invitation to him, correct?

A. Yup.

Q. And that was after he adamantly invoked his rights not to talk to you. You're trying to encourage him to talk, correct?

A. I gave him an opp—an option.

Q. Right. But you've been around, you know what the law is, correct?

A. And he initiated the conversation.

(*Id.* at 118-120).

**{¶ 34}** In *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), the defendant asserted his right to counsel and his right to remain silent, and police stopped questioning him. While being transported to jail, the defendant then asked, "Well, what is going to happen to me now." *Id.* at 1045. The United States Supreme Court reasoned that this question was sufficient to constitute initiation of generalized discussion about the case:

Although ambiguous, the respondent's question in this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship. It could reasonably have been interpreted by the officer as relating generally to the investigation. * * *

*Id.* at 1045-1046.

**{¶ 35}** In the present case, Villegas asked, "What is the process from here?" Consistent with *Bradshaw*, I conclude this question by Villegas was sufficient to show a willingness and a desire to discuss his case generally. But even if the first question alone

was insufficient, Villegas also asked another question. Immediately after Gebhart explained the procedure, Villegas asked, "What if I sign your paper?" In my view, this open-ended question was reasonably interpreted by Gebhart as evincing a willingness and a desire to discuss the case. Moreover, by asking what would happen if he signed the rights-waiver form, Villegas invited the response that followed and to which he now objects. Gebhart accurately responded that if Villegas signed the form he would have an opportunity to tell his side of the story and help himself by minimizing or mitigating his involvement. There is nothing legally objectionable about this answer, which was directly responsive to the question Villegas asked. Gebhart's direct and accurate answer to Villegas' question about signing the rights-waiver form cannot be interpreted as the functional equivalent of unlawful interrogation. It is unreasonable to expect the detective not to answer a prisoner's questions when to do so is both discourteous and disrespectful.

{¶ 36} I find little distinction between the facts in *Bradshaw* and this case. The majority devalues the holding in *Bradshaw* by noting that it was a plurality decision and "not binding precedent." It is accurate that four justices agreed in the majority opinion and Justice Powell concurred. But with five justices concurring, the holding of *Bradshaw* is that given the facts before that court, *Bradshaw's* Fifth Amendment constitutional rights were not infringed and "Bradshaw knowingly and intelligently waived his right to counsel." *Bradshaw* at 1051 (Powell, J., concurring in judgment).

{¶ 37} Once it is determined that Villegas himself "initiated" further conversation with Gebhart within the meaning of *Bradshaw*, the remaining question is whether he knowingly and intelligently waived his right to remain silent when the detective asked him questions. The trial court never addressed this waiver issue because it had determined

that Gebhart's questioning was a Fifth Amendment violation. Resolution of this issue depends on the particular facts and circumstances of the case under a totality-of-the-circumstances analysis. *Bradshaw* at 1046. The fact that Villegas reopened the dialogue with Gebhart is a relevant but not a dispositive consideration. *Id.*

{¶ 38} The record persuades me that Villegas did validly waive his right to remain silent. Notably, he reopened the dialogue with Gebhart shortly after having been advised of his *Miranda* rights and having exercised his right to remain silent. After refusing to talk in the interview room, Villegas was escorted downstairs to a jail cell. Although Gebhart did not remind Villegas of his Fifth Amendment rights when Villegas started talking outside of the jail cell, it is unreasonable to believe that Villegas forgot what the detective had just told him upstairs. The fact that Villegas was not reminded of his *Miranda* rights is a relevant consideration under the totality-of-the-circumstances test. But the warnings given in the interview room undoubtedly were sufficiently proximate in time and place to retain their effectiveness at the jail cell. "Police are not required to readminister *Miranda* warnings to a suspect when a relatively short period of time has elapsed since the initial warnings." *State v. Powell,* 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 119. Villegas' awareness of his right to remain silent, and his waiver of that right, is apparent from the fact that he invoked the right a second time outside the jail cell when, after engaging in some additional conversation with the detective, he decided not to answer any more questions and stopped talking. The fact that Villegas initially refused to talk in the interview room, then initiated conversation outside the jail cell, then stopped talking when he wanted the conversation to end demonstrates that he was aware of the right to remain silent and that he knowingly and intelligently waived that right when he desired to

do so.

{¶ 39} Finally, I believe the trial court erred in finding the present case analogous to *State v. Kerby*, 162 Ohio App.3d 353, 2005-Ohio-3734, 833 N.E.2d 757 (2d Dist.), and in relying on it to suppress Villegas' statements. In *Kerby*, the defendant was arrested and invoked his right to remain silent shortly after police interrogation began. At that point, the interrogation stopped. Several hours later, police interrogation of the defendant resumed, allegedly at his request. After again being advised of his *Miranda* rights, the defendant made incriminating statements that he later sought to suppress. The trial court denied the motion.

{¶ 40} On appeal in *Kerby*, this court recognized that, once a defendant invokes his right to remain silent, police cannot resume interrogation, either directly or indirectly, "by encouraging the suspect to tell his side of the story in order to help himself, which is the functional equivalent of interrogation." *Id.* at ¶ 87, citing *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). This court recognized that such inducements may be permissible, however, if they follow a defendant's own request to speak with police. *Id.* at ¶ 88. Despite a detective's assertion in *Kerby* that the defendant reinitiated the conversation, this court made its own factual determination, concluding that the record belied the claim. *Id.* at ¶ 91 (finding that the record "compel[led] a conclusion that the exchange was initiated by [the detective], not by the defendant").

{¶ 41} Unlike *Kerby*, the jail-cell discussion between Gebhart and Villegas was indisputably initiated by Villegas, not the detective. The trial court indicated "Villegas resumed some form of communication with Det. Gebhart by asking questions about the procedure and the status of the rented vehicle." (Doc. # 26 at 13). In addition, Gebhart's

remarks about potential advantages to Villegas if he answered further questions came only after Villegas specifically asked the detective what would happen if he signed the rights-waiver form. For these reasons, *Kerby* is inapposite on its key facts.

{¶ 42} Based on the foregoing analysis, I would sustain the State's assignment of error, reverse the trial court's August 17, 2016 suppression order, and remand the case for further proceedings. Accordingly, I dissent.

Copies mailed to:

Mathias H. Heck
Michael J. Scarpelli
Paul E. Wagner
Hon. Michael W. Krumholtz