[Cite as *State v. White*, 2018-Ohio-3076.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27749 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-1517/1 |
| | : | |
| JERMAR W. WHITE | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 3rd day of August, 2018.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. JANS, Atty. Reg. No. 0084470, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45402
      Attorney for Plaintiff-Appellee

BEN M. SWIFT, Atty. Reg. No. 0065745, P.O. Box 49637, Dayton, Ohio 45449
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Jermar W. White was convicted after a bench trial in the Montgomery County Court of Common Pleas of unlawful sexual conduct with a minor (10 or more years older than the victim), pandering obscenity involving a minor, two counts of trafficking in persons, and two counts of compelling prostitution in furtherance of human trafficking. White was acquitted of two additional charges.   The trial court designated him a Tier II sex offender and sentenced him to concurrent sentences totaling 11 years in prison.

{¶ 2} White appeals from his convictions, raising five assignments of error.   He claims that (1) the trial court erred in denying his motion to suppress evidence, (2) his convictions were based on insufficient evidence and against the manifest weight of the evidence, (3) he received ineffective assistance of counsel, (4) the trafficking in persons statute, R.C. 2905.32(A)(2)(a), is unconstitutionally vague, and (5) the State engaged in misconduct when it offered at trial the testimony of his co-defendant, Iesha Heard.

{¶ 3} For the following reasons, the trial court's judgment as to the charge of pandering obscenity involving a minor (Count 4) will be reversed.   In all other respects, the trial court's judgment will be affirmed.

### I. Motion to Suppress

{¶ 4} In his first assignment of error, White claims that the trial court erred in failing to suppress statements that he made to the police, as well as evidence that was seized pursuant to a search warrant that was obtained in reliance on those statements.

{¶ 5} In deciding a motion to suppress, the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses.   *State v. Pence*, 2d Dist. Clark No. 2013 CA 109, 2014-Ohio-5072, ¶ 7, citing

*State v. Hopfer*, 112 Ohio App.3d 521, 548, 679 N.E.2d 321 (2d Dist.1996). The court of appeals must accept the trial court's findings of fact if they are supported by competent, credible evidence in the record. *State v. Isaac*, 2d Dist. Montgomery No. 20662, 2005-Ohio-3733, ¶ 8, citing *State v. Retherford*, 93 Ohio App.3d 586, 639 N.E.2d 498 (2d Dist.1994). Accepting those facts as true, the appellate court must then determine as a matter of law, without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied. *Id.*

{¶ 6} Detective John Howard of the Dayton Police Department, Street Crimes Unit, was the sole witness at the suppression hearing. The State also presented two exhibits: (1) a DVD of Howard's interviews with White and Heard at the police station, and (2) a search warrant packet for the home where White was staying. Howard's testimony and the State's exhibits established the following facts.

{¶ 7} In April 2016, 15-year-old J.J. met White (age 31) and White's girlfriend, Heard, at a friend's house in Huber Heights. White was introduced as "Shiloh." Approximately three weeks later, on or about May 8, 2016, J.J. was walking with two friends when a car driven by White pulled up; Heard was in the front passenger seat. J.J. entered the vehicle, and they went to a residence on Lilac Avenue in Dayton.

{¶ 8} On May 10, 2016, J.J reported several encounters that she had with "Shiloh" to two employees at her school. The employees transported J.J. to the police department, where J.J. indicated that sexual conduct and activity occurred in a house, which she could describe. J.J. described White and Heard and the vehicle they were driving. J.J. directed a uniformed officer to the house on Lilac Avenue.

{¶ 9} The police conducted surveillance on the residence. The police saw White

and Heard enter the vehicle that J.J. had described. Officers conducted a traffic stop of the vehicle, and White and Heard were transported to the police station.

{¶ 10} Detective Howard and Detective Mistan Bailey were assigned to the case. Their unit, the Street Crimes Unit, investigates street-level drug dealers, prostitution, human trafficking, and liquor permits, with an emphasis on prostitution and human trafficking. Detective Howard separately interviewed J.J., Heard, and White at the police station on May 10; Detective Bailey was present and took notes. Both of the interviews of Heard and White occurred in an interview room that was equipped with an audiovisual recording device. Heard corroborated many of the statements that J.J. had made.

{¶ 11} Detective Howard spoke with White after interviewing Heard. After confirming White's name and address and asking a few preliminary questions, Howard advised White of his *Miranda* rights using a card that he was provided by the prosecutor's office. White stated that he understood each of his rights. Howard asked White a few additional questions, and White answered.

{¶ 12} Shortly after the questioning began, White stated, "I really don't right now even want to answer any questions," and he expressed that he thought he was brought to the police station illegally and described how he was brought there. Howard responded, "So do you want to talk to me or do you not." White replied that he did not know what the process was, and he wanted to know if he would be booked into the jail that night. The detectives explained that it was a possibility that White would go to jail. For approximately ten minutes, Howard asked more questions about what occurred between White, Heard, J.J., and S.M. (another juvenile victim), and White responded. White denied knowledge of the Backpage website, taking photos of S.M. and J.J., and

having J.J. perform oral sex on him.   At the end of the interview, Howard told White that he would be booked into the jail.   The entire interview lasted approximately 15 minutes. White did not, at any time, indicate that he wanted a lawyer.

{¶ 13} Howard testified at the suppression hearing that White was then placed in a different interview room closer to the detectives' desks so that he (Howard) could complete paperwork.   Shortly after being placed in the second room, which did not have audiovisual equipment, White knocked on the door, wanting to speak with Detective Howard.   Howard and Bailey entered the room and told White that if he wanted to talk, they could return to the first interview room.   White told the detectives that he did not want to go back to the other room, but that "people are always making these types of accusations or complaints against him."   White stated that the "same thing happened two or three years ago."   Detective Howard told White that if White wanted to keep talking, they could go back to the first interview room.   White declined, and the detectives stopped talking with White.

{¶ 14} After the interview with White, the police obtained a search warrant for the residence on Lilac Avenue, which belonged to White's sister.   The warrant was based on statements by J.J., Heard, and White.   The warrant was signed by a judge and executed within three days.

{¶ 15} In denying White's motion to suppress, the trial court found that Howard advised White of his *Miranda* rights, that White "willingly participated in the conversation with the police officers" and "spoke freely to the police after acknowledging that he understood his rights."   The trial court further found that White's statements were made voluntarily.   Finally, the trial court concluded that the search warrant was supported by

probable cause.

{¶ 16} Under the Fifth Amendment to the United States Constitution, no person shall be compelled to be a witness against himself or herself. In order to ensure that this right is protected, statements resulting from custodial interrogations are admissible only after a showing that the procedural safeguards described in *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), have been followed. *State v. Earnest*, 2d Dist. Montgomery No. 26646, 2015-Ohio-3913, ¶ 21. To counteract the coercive pressure of custodial interrogations, police officers must warn a suspect, prior to questioning, that he or she has a right to remain silent and a right to the presence of an attorney. *Maryland v. Shatzer*, 559 U.S. 98, 103–104, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010), citing *Miranda*.

{¶ 17} A "suspect may effectively waive [his or her *Miranda*] rights * * * only if the waiver is made voluntarily, knowingly and intelligently." *State v. Dailey*, 53 Ohio St.3d 88, 91, 559 N.E.2d 459 (1990), citing *Miranda* at 444. Thus, a court may recognize the validity of a waiver of *Miranda* rights only if it finds that (1) "the relinquishment of the right[s] [was] voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and (2) the person had "a full awareness of both the nature of the right[s] being abandoned and the consequences of the decision to abandon [them]." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *State v. Marejka*, 2d Dist. Montgomery No. 27662, 2018-Ohio-2570, ¶ 14. "[A] suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." *Burghuis v. Thompkins*, 560 U.S. 370, 388-389, 130

S.Ct. 2250, 176 L.Ed.2d 1098 (2010). Courts examine the totality of the circumstances to determine whether a suspect has knowingly, intelligently, and voluntarily waived his or her *Miranda* rights. *State v. Clark*, 38 Ohio St.3d 252, 261, 527 N.E.2d 844 (1988).

{¶ 18} The opportunity to exercise *Miranda* rights exists throughout the interrogation, and thus, the interrogation must cease when the defendant exercises his right to end the questioning. *State v. Villegas*, 2d Dist. Montgomery No. 27234, 2017-Ohio-2887, ¶ 13; *State v. Miller*, 7th Dist. Mahoning No. 13 MA 12, 2014-Ohio-2936, ¶ 41, citing *Miranda* at 473-474 and *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (recognizing that a defendant's right to "cut off questioning" must be "scrupulously honored").

{¶ 19} "Whether a statement was made voluntarily and whether an individual knowingly, voluntarily, and intelligently waived his or her *Miranda* rights are distinct issues." *State v. Lovato*, 2d Dist. Montgomery No. 25683, 2014-Ohio-2311, ¶ 30. A defendant's statements to police after a knowing, intelligent, and voluntary waiver of the individual's *Miranda* rights are presumed to be voluntary. *Id.,* citing *Miranda*. "The *Miranda* presumption applies to the conditions inherent in custodial interrogation that compel the suspect to confess. It does not extend to any actual coercion police might engage in, and the Due Process Clause continues to require an inquiry separate from custody considerations and compliance with *Miranda* regarding whether a suspect's will was overborne by the circumstances surrounding his confession." *State v. Porter*, 178 Ohio App.3d 304, 2008-Ohio-4627, 897 N.E.2d 1149, ¶ 14 (2d Dist.), citing *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

{¶ 20} "In deciding whether a defendant's confession is involuntarily induced, the

court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, overruled on other grounds, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978). *See also State v. Brewer*, 48 Ohio St.3d 50, 58, 549 N.E.2d 491 (1990); *State v. Beaty*, 2d Dist. Montgomery No. 24048, 2011-Ohio-5014, ¶ 16.

{¶ 21} In general, the State has the burden to show by a preponderance of the evidence that a defendant's confession was voluntarily given. *State v. Melchior*, 56 Ohio St.2d 15, 381 N.E.2d 195 (1978).

{¶ 22} At the outset, the State contends that White was not in custody at the time of the interview at the police station. The State notes that, although White was transported to the station by the police, he was not handcuffed or restrained, the door to the interview room was open, and Detective Howard told White that he (White) might be booked into jail that day, but he (Howard) did not know yet.

{¶ 23} *Miranda* defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "[T]he ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). Whether a person is subject to custodial interrogation is an objective question, focusing

on how a reasonable person in the suspect's position would have understood the situation. *J.D.B. v. North Carolina*, 564 U.S. 261, 270, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011); *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

{¶ 24} Detective Howard testified at the suppression hearing that officers were conducting surveillance of the Lilac Avenue residence while he and Detective Bailey interviewed J.J. at the police station. After officers observed White and Heard get into a vehicle that matched the description J.J. had given, officers conducted a traffic stop of the vehicle. Officers then transported White and Heard to the police station, where Detective Howard interviewed them after providing *Miranda* warnings. Statements made by White during his interview reflected that he did not believe that he had been lawfully brought to the police station and that he was not there voluntarily. White indicated to Detective Howard that he was handcuffed while he was transported to the police station, although the record does not indicate on what grounds he was brought to the station. Given that White was transported involuntarily to the police station in handcuffs and that he was interviewed at the station, we conclude that White was in custody when he was interviewed by Howard.

{¶ 25} We have reviewed the video-recording of White's interview at the police station. The interview occurred in a small interview room equipped with a table against the wall and three chairs, which were occupied by White and Detectives Howard and Bailey. Howard asked White a few preliminary questions to confirm White's name and address and whether he had previously been read his *Miranda* rights, and then Howard read White his *Miranda* rights from a card provided by the prosecutor's office. White indicated that he understood his rights. White was not asked if he wished to waive his

*Miranda* rights, but he proceeded to answer Detective Howard's questions. We find nothing in the interview process that would suggest that White's decision to subsequently speak to the detective was involuntary.

{¶ 26} Turning to the voluntariness of White's statements, the record reflects that White's interview began at approximately 9:00 p.m. and lasted for less than 20 minutes. White carried a glass of water when he entered the room; he was not handcuffed. White provided his birthdate to Detective Howard; he was 31 years old. White had previously been arrested, most recently the year before the interview; White's answer to whether he had previously been informed of his rights was difficult to hear, but it sounded like he did not recall. White did not appear to be under the influence of drugs or alcohol, and he appeared to be intelligent. Although some of the exchanges between White and Detective Howard were argumentative, Howard made no threats, promises, or any other coercive statements. There is no evidence of coercive police activity. The record thus supports the trial court's conclusion that White's statements were voluntarily made.

{¶ 27} Within a few minutes of the start of the interview, White expressed that he "really don't right now even want to answer any questions," and he expressed that he thought the stop of his vehicle and his transportation to the police station were unlawful. While a suspect's right to "cut off questioning" must be "scrupulously honored," the suspect's invocation of that right must be clear and unambiguous. *Burghuis*, 560 U.S. at 381, 130 S.Ct. 2250, 176 L.Ed.2d 1098; *State v. Blythe*, 2d Dist. Montgomery No. 24961, 2013-Ohio-1688, ¶ 25. White's comment about not wanting to answer questions was immediately followed by several statements complaining about how he was brought to the police station. Taken together, White did not clearly or unambiguously state that

he wanted the interview to cease; rather, he expressed to Detective Howard that he did not want to talk until he understood why he was there. Based on White's unclear statement regarding whether he wanted to invoke his right to remain silent, Detective Howard properly asked White if he wanted to continue talking. *See Davis v. United States*, 512 U.S. 452, 461, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) ("[W]hen a suspect makes an ambiguous or equivocal statement [regarding an attorney,] it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney."). White responded by asking Detective Howard what the process was and whether he was going to be booked into jail; Howard responded, "Possibly." White told Howard that another officer had said that White would be arrested, and the two men discussed the inconsistency in the responses that White had received.

{¶ 28} Detective Howard then asked White again if he wanted to talk to him (Howard). White stated, "I don't understand why I should talk to you if I can't just get a solid answer" about whether he (White) was going to be jailed. Detective Howard responded that he had given White a solid answer, and Detective Bailey told White that Howard was trying to explain the situation to him. White then stated that he did not know anything about Backpage and had "nothing to do with" Backpage, and he asked Howard what was going on. Howard then asked White about whether J.J. and S.M. had been to his house, and White answered. Howard and White then had an exchange about whether anyone had given oral sex to him and other allegations that had been made.

{¶ 29} After reviewing the video of White's interview, we conclude that White's statements were not made after a clear and unambiguous invocation of his right to remain silent.

**{¶ 30}** The trial court also did not err in failing to suppress White's statement made in the second interview room. "Police are not required to readminister *Miranda* warnings to a suspect when a relatively short period of time has elapsed since the initial warnings." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 119.

> When deciding whether initial warnings remain effective for later interrogations, courts look at the totality of the circumstances. *Powell* at ¶ 119, citing *State v. Roberts*, 32 Ohio St.3d 225, 232, 513 N.E.2d 720 (1987). Courts are instructed to consider: (1) the length of time between the initial warnings and the subsequent interrogation; (2) whether the warnings and the subsequent interrogation were given in different places; (3) whether the warnings given and the subsequent interrogation were conducted by different officers; (4) the extent to which statements given in the subsequent interrogation differed from previous statements; and (5) the apparent intellectual and emotional state of the suspect. *Roberts* at 232, quoting *State v. McZorn*, 288 N.C. 417, 434, 219 S.E.2d 201 (1975). The purpose of the test is to "determine whether the initial warnings have become so stale and remote that there is a substantial possibility that the individual was unaware of his constitutional rights at the time of the subsequent interrogation." *State v. Grissom*, 1st Dist. No. C-100542, 2011-Ohio-1796, ¶ 13, citing *McZorn* at 434.

*State v. Kottner*, 1st Dist. Hamilton No. C-120350, 2013-Ohio-2159, ¶ 24.

**{¶ 31}** Detective Howard testified at the suppression hearing that, after the first interview ceased, he took White to a different interview room that did not have video-

recording equipment. Howard testified that he "locked the door, turned around to walk away, and he [White] knocked on the door as I was turning to walk away." Howard testified the he unlocked the door, opened it, and asked White, "What's up?" White asked to talk to him (Howard). Howard further testified:

> I told Bailey to come over. I told him [White] if he wanted to keep on talking to me, can we go back to the other room? He was – didn't want to go over there. He made the statement that this type of thing happened to him two or three years ago. At that point I stopped him and asked him, did he want to go back to the interview room and talk to me? And he said no, and I closed the door.

**{¶ 32}** Based on Howard's testimony, which the trial court found credible, a very short period of time elapsed between the end of the first interview and when White reinitiated a conversation with Detective Howard. White had simply been moved down the hall to a different room. Under these circumstances, Howard was not required to provide *Miranda* warnings a second time. Moreover, although Howard asked White if he wanted to go back to the first interview room, White's subsequent statement that "this type of thing" had previously happened was a spontaneous, voluntary statement and not the product of interrogation by Howard. Finally, White's statements to Howard in the second interview room were not introduced at trial; accordingly, any error in failing to suppress those statements was harmless.

**{¶ 33}** Finally, White asserts that all evidence seized pursuant to the search warrant should have been suppressed, because the search warrant relied on statements made by White to the detectives at the police station. Having concluded that the trial

court properly denied White's motion to suppress the statements he made at the police station, the search warrant affidavit was not deficient for referencing the statements that White made. And, upon our independent review of the search warrant affidavit, we conclude that the search warrant was supported by probable cause, even if the references to White's statements at the police station were excluded.

{¶ 34} White's first assignment of error is overruled.

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 35} In his second assignment of error, White claims that his convictions were based on insufficient evidence and were against the manifest weight of the evidence.

{¶ 36} A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to sustain the verdict as a matter of law. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 37} In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness

credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 38}** Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

**{¶ 39}** The State's evidence at trial established the following facts.

**{¶ 40}** In the spring of 2016, J.J. and S.M., both 15 years old, were best friends. S.M. was also friends with Heard, whom S.M. had known since elementary school; Heard was older than J.J. and S.M., and Heard was involved with White, who was 31 years old. J.J. first met Heard at S.M.'s house; this encounter was brief and unremarkable.

**{¶ 41}** In April 2016, Heard and White picked up S.M. and J.J. in White's vehicle; White was introduced as "Shiloh." The four drove around and smoked marijuana. (This was referred to as a "blunt cruise.") At some point, the car stopped, and White moved from the front seat to the back seat to sit with J.J.; S.M. moved to the front seat and began driving with Heard in the passenger seat. S.M. testified that Heard asked her if she knew what escorting was, and S.M. said no. Heard told S.M. that it was "basically prostitution" and "then they [Heard and White] told [S.M.] and [J.J.] that they needed more people to

do it with them." (Trial Tr. at 248.) White asked J.J. if she had been sexually active and if she ever thought about making money for it. J.J. responded that she would not consider doing anything like that. White told J.J. that if she considered doing sex acts for money, he, Heard, and S.M. would be part of it with her. J.J. understood that "money would be made and then would be given to [White] and if anything I needed [sic], I would have to go to him for it." (Trial Tr. at 112.) J.J. said to White that she did not agree with what he was proposing, and the conversation between J.J. and White became heated. S.M. told J.J. to calm down and listen to what White had to say. White and Heard left S.M. and J.J. at S.M.'s house. J.J. recalled White's saying that he would see her again.

{¶ 42} On Saturday, May 7, 2016, J.J. was walking to the store with two friends when she saw Heard and White in a car. J.J. asked White, who was driving, if he could give the group a ride to the store. White agreed, and the three climbed into the back seat of the car. As they headed to the store, White stated that he needed to stop at "the house," which Heard identified as White's sister's home. White drove to a residence on Lilac Avenue in Dayton; the five sat in the driveway and smoked a "blunt." White then went inside the house.

{¶ 43} After a while, Heard drove J.J.'s friends home, and she asked J.J. to send a message to S.M. for her. After communicating with S.M., Heard picked up S.M. in the car, and the three (Heard, S.M., and J.J.) went to Wal-Mart and then back to the Lilac Avenue house. Upon reaching the house, the group went inside and down to the basement, where White was.

{¶ 44} The four drank alcohol, and White talked to J.J. and S.M. about engaging

in sex for hire. J.J. testified that "it was mainly Shiloh talking." (Trial Tr. at 130.) White told J.J. and S.M. that they would make money and give it to him, and they would go to him if they needed anything. White told J.J. what the prices would be based on the amount of time spent. J.J. testified that White told her that she would be doing sex acts ranging from just sitting with the person to oral sex to "regular sex" with that person. (Trial Tr. at 131.) White told J.J. that a condom would be used. White referred to these encounters as "plays" and said that the amount J.J. would earn would depend on the number of plays. White also told J.J. and S.M. that they would receive a phone (to share) for their plays. That night, J.J. and S.M. slept in the basement of the Lilac Avenue residence.

{¶ 45} The next morning (Sunday, May 8), White made breakfast for them and told them that they needed to take photographs for Backpage, a website where they could advertise "escort" services. White told J.J. and S.M. to wear their bras and underwear for the photos. White later had J.J. and S.M. remove their bras for some photos. Individual photos were taken of J.J. and S.M.; White told J.J. and S.M. how to pose. White then took photos of J.J., S.M., and Heard together, again telling them how to pose (topless), because White was "going to put us on Backpage as a package." (Trial Tr. at 139.) All of the photos were taken on Heard's cell phone. White gave pseudonyms for the girls on Backpage: J.J. was Royalty, S.M. was Loyalty, and Heard was Honesty.

{¶ 46} J.J. testified that White had a gun that he kept in his pocket; White told her that if anything went wrong during a play, he would handle it.

{¶ 47} S.M. and J.J. spent the rest of the day at the Lilac Avenue residence. At some point, White told J.J., S.M., and Heard that they would "practice" sex acts on him.

White told them that "if we couldn't be able to act on him, then we most likely won't want to act on strangers." (Trial Tr. at 153.) White put on a condom, and Heard performed oral sex first, then J.J. performed oral sex, and S.M. went third. That evening, they again smoked marijuana and drank alcohol, and they all slept there overnight.

{¶ 48} While J.J. was "napping" on Sunday night, she was awakened by Heard and told that she (J.J.) had a $500 play. J.J. stated that she did not feel like going and went back to sleep. (Heard testified that J.J. did not actually have a play, and the statement was a joke.) On Monday night, Heard went on a play and S.M. left with her, but J.J. stayed behind; Heard had told J.J. that White "wanted his alone time with" J.J. (Trial Tr. at 157.) After Heard and S.M. had left, White tried to "lay with" J.J., but J.J. would not let him. White then put on a condom, told J.J. that he wanted her to perform oral sex on him, and said he would pay her. J.J. asked if White would leave her alone if she complied, and White said yes. J.J. then performed oral sex on White. J.J. tried to pull away, but White held her head until he ejaculated.

{¶ 49} J.J. testified that White never asked how old she was, but he knew how old S.M. was and that S.M. and J.J. had gone to the same school. J.J. testified that she told Heard that she (J.J.) was 15, and that White was seated next to her in the car when this conversation occurred. White told J.J. that she should tell people that she was 18. S.M. testified that White had asked about J.J.'s and her age; S.M. did not recall whether this occurred during the "blunt cruise" or the first night at the house. S.M. testified that "[w]e both told him – [.J.J.] was 15 at that time. And I'm pretty sure I told him I was 16 because my birthday was coming up." (Trial Tr. at 253.)

{¶ 50} On Tuesday, May 10, Heard and White drove J.J. to school and S.M. home;

Heard and White expected to pick up J.J. and S.M. after school. Beatrice Keeton, a group leader at J.J.'s school, noticed that J.J. had been absent on May 9 and that, on May 10, J.J. was wearing nicer clothes than she usually wore and had money that she typically did not have. Toward the end of the school day, Keeton pulled J.J. aside and asked her what was going on. J.J. appeared a bit anxious and rocked in her chair; she told Keeton what had happened. Keeton relayed the information to her supervisor, Tasha Stertmeyer, who then also spoke with J.J. Stertmeyer contacted the police, who asked Keeton and Stertmeyer to bring J.J. to the station.

{¶ 51} After speaking with an officer, Keeton, Stertmeyer, the officer, and J.J. got into Strertmeyer's car, and J.J. directed them to the house on Lilac Avenue. J.J. also pointed out the car that Heard and White used. The four then returned to the police station. White and Heard were arrested later that day. The police subsequently contacted S.M. about what had occurred.

{¶ 52} After a police investigation, White was indicted for

- Counts 1 & 2: unlawful sexual conduct with a minor (10 or more years older than the victim – J.J. and S.M., respectively)

- Count 3: rape (force or threat of force – J.J.)

- Count 4: pandering obscenity involving a minor

- Counts 5 & 6: trafficking in persons (J.J. and S.M., respectively)

- Counts 7 & 8: compelling prostitution, with a human trafficking specification (J.J. and S.M., respectively).

The trial court acquitted White of Counts 2 and 3, but found him guilty on the remaining six charges.

{¶ 53} On appeal, White claims that the State presented insufficient evidence to support his convictions on Counts 1, 4, 5, and 6. White does not challenge the sufficiency of the State's evidence regarding Counts 7 and 8.

{¶ 54} R.C. 2907.04(A), unlawful sexual conduct with a minor, provides: "No person who is eighteen years of age or older shall engage in sexual conduct with another, who is not the spouse of the offender, when the offender knows the other person is thirteen years of age or older but less than sixteen years of age, or the offender is reckless in that regard." White claims that the State presented no evidence that White knew J.J.'s age or that he acted in disregard of a known risk that she was under 16 years of age.

{¶ 55} We disagree with White's contention. On direct examination, J.J. testified that White never asked how old she was, but he knew how old S.M. was and that S.M. and J.J. had attended the same school. During cross-examination, J.J. testified that, during the "blunt cruise," Heard asked her how old she was. J.J. testified that she told Heard that she was 15 and was turning 16 in November. J.J. stated that she assumed that White also learned how old she was, because White "was listening. He was there. He was sitting right next to me when I told her how old I was." (Trial Tr. at 224.) J.J. had previously testified on direct examination that White told her to tell people that she was 18. Moreover, S.M. expressly testified that White had asked her about J.J.'s and her age; S.M. did not recall whether this occurred during the "blunt cruise" or the first night at the house. S.M. testified that White was told that J.J. was 15 years old. J.J.'s and S.M.'s testimony, if believed, was sufficient to prove that White knew that J.J. was thirteen years of age or older but less than sixteen years of age or that White was reckless in that regard. White's conviction on Count 1 was not based on insufficient evidence.

{¶ 56} Count 4 involved pandering obscenity involving a minor, in violation of R.C. 2907.321(A)(1). That statute provides that "[n]o person, with knowledge of the character of the material or performance involved, shall do any of the following: (1) Create, reproduce, or publish any obscene material that has a minor as one of its participants or portrayed observers." White claims that the photographs of S.M. and J.J. were created jointly by Heard, S.M., J.J., and White, and that they were reproduced and published by Heard, not White. He further claims that the photos were not "obscene."

{¶ 57} R.C. 2907.01(F) defines "obscene" materials as follows:

When considered as a whole, and judged with reference to ordinary adults or, if it is designed for sexual deviates or other specially susceptible group, judged with reference to that group, any material or performance is "obscene" if any of the following apply:

(1) Its dominant appeal is to prurient interest;

(2) Its dominant tendency is to arouse lust by displaying or depicting sexual activity, masturbation, sexual excitement, or nudity in a way that tends to represent human beings as mere objects of sexual appetite;

(3) Its dominant tendency is to arouse lust by displaying or depicting bestiality or extreme or bizarre violence, cruelty, or brutality;

(4) Its dominant tendency is to appeal to scatological interest by displaying or depicting human bodily functions of elimination in a way that inspires disgust or revulsion in persons with ordinary sensibilities, without serving any genuine scientific, educational, sociological, moral, or artistic purpose;

(5) It contains a series of displays or descriptions of sexual activity,

masturbation, sexual excitement, nudity, bestiality, extreme or bizarre violence, cruelty, or brutality, or human bodily functions of elimination, the cumulative effect of which is a dominant tendency to appeal to prurient or scatological interest, when the appeal to such an interest is primarily for its own sake or for commercial exploitation, rather than primarily for a genuine scientific, educational, sociological, moral, or artistic purpose.

**{¶ 58}** The State states, citing *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) and *Urbana ex rel. Newlin v. Downing*, 43 Ohio St.3d 109, 539 N.E.2d 140 (1989), that obscenity requires a depiction of sexual conduct in a patently offensive way. It notes that the photographs of S.M. and J.J. depict only sexual contact, not sexual conduct, as defined by R.C. 2907.01. The State thus concedes that the photographs were not "obscene" and that there was insufficient evidence to support White's conviction for pandering obscenity involving a minor.

**{¶ 59}** The State presented individual photographs of S.M. and J.J. wearing lacy underwear. In several photos, S.M. and J.J. covered their bare breasts with their hands. Other photos showed S.M. and J.J. from behind, focusing on their buttocks. There are also a series of photographs with S.M., J.J., and Heard together; a few show them lying in a "spooning" pose, with S.M. in the middle and Heard's hand on S.M.'s buttocks. Although the photographs are undoubtedly sexual in nature, we agree with the State's assessment that the photographs of J.J. and S.M. are not obscene, as that term is defined by statute and case law. White's claim that his conviction on Count 4 was based on insufficient evidence is sustained.

**{¶ 60}** Next, White claims that the State failed to present sufficient evidence to

support his convictions for trafficking in persons in violation of R.C. 2905.32(A)(2)(a). That statute provides, in relevant part:

> (A) No person shall knowingly recruit, lure, entice, isolate, harbor, transport, provide, obtain, or maintain, or knowingly attempt to recruit, lure, entice, isolate, harbor, transport, provide, obtain, or maintain, another person if any of the following applies:
>
> * * *
>
> (2) The other person is less than sixteen years of age * * *, and * * * the offender's knowing recruitment, luring, enticement, isolation, harboring, transportation, provision, obtaining, or maintenance of the other person or knowing attempt to recruit, lure, entice, isolate, harbor, transport, provide, obtain, or maintain the other person is for any of the following purposes:
>
> (a) To engage in sexual activity for hire[.]

**{¶ 61}** White contends that there was no evidence that he knowingly recruited S.M. and J.J. He asserts that Heard "chose to recruit SM and indirectly JJ. White did not know either of them. * * * The evidence shows that White merely helped Heard with her attempts and eventual recruitment of SM and JJ."

**{¶ 62}** The State presented evidence that White was the "mastermind" behind the Backpage operation, and that he knowingly was involved in the recruitment of J.J. and S.M. as additional escorts. Heard testified on direct examination that she met White through an ex-boyfriend and communicated with White on Facebook when she lived in Wilmington, Ohio. In March 2016, White asked Heard to come to Dayton to make some money. Heard originally believed that she would be selling drugs, but White introduced

Heard to a woman in Xenia and told Heard to watch how that woman worked. White told Heard about Backpage, that she would be having sexual intercourse, and about what she could charge based on the amount of time she spent with clients. White called this "escorting" or "hitting a play." White and the Xenia woman took photos of Heard for a Backpage ad. When White and Heard came to Dayton a couple days later, Heard began going out on "plays" – up to four per day – and gave the money to White. Heard testified that White wanted her to find more females to do escorting; White told Heard that she would not have to do "plays" anymore if she got other females involved.

{¶ 63} Although White was introduced to S.M. and J.J. by Heard, there was evidence that White actively tried to recruit them as additional escorts. S.M. testified that, during the "blunt cruise," both Heard and White told J.J. and her that they (Heard and White) needed more people to do plays. J.J. testified that White asked her if she had been sexually active and if she ever thought about making money for it. J.J. further testified that White said that if she (J.J.) considered doing sex acts for money, he, Heard, and S.M. would be part of it with her. Heard also testified that White had conversations with J.J. and S.M. about getting them involved; White said that it was good money and better than just having sex for free. Both J.J. and S.M. understood that the money they made from plays would be given to White. J.J. and S.M. both described how White brought up taking pictures to upload to Backpage to get clients and that White directed the photoshoot (what they wore and how they posed). White brought up that J.J. and S.M. needed to practice on him so that they would be able to perform oral sex on strangers. Heard testified that both she and White used her phone to respond to Backpage clients. Upon review of the evidence, the State presented sufficient evidence

for the trial court to conclude that White knowingly attempted to recruit S.M. and J.J. to engage in sex for hire.

**{¶ 64}** Finally, White claims that his convictions were against the manifest weight of the evidence. He argues that Heard, not he, was the individual who needed the money, recruited S.M. and J.J., encouraged S.M.'s and J.J.'s participation, and advertised them on Backpage on Heard's ad with Heard's phone. White does not specify the counts to which this argument is directed. However, it appears to relate to both trafficking in persons counts (Counts 5 and 6), as well as the counts of promoting prostitution in violation of R.C. 2907.21(A)(2) (Counts 7 and 8), which prohibits a person from knowingly inducing, procuring, encouraging, soliciting, requesting, or otherwise facilitating a minor to engage in sexual activity for hire.

**{¶ 65}** As White argues, there was evidence at trial that Heard wanted to have her own business (a strip club) and that she was trying to earn money so she could do that. The State's evidence indicated that Heard knew S.M. from her childhood, that she met J.J. through S.M., and that she talked with S.M. about working as an "escort." J.J. and S.M. also testified that both Heard and White talked to them about engaging in sexual activity for money. On cross-examination, Heard acknowledged that when she brought J.J. and S.M. to the Lilac Avenue residence, she told them that she was making "good money" on Backpage. The State's evidence further indicated that Heard participated in the photo session, encouraged J.J. and S.M. to "practice" oral sex on White, and used her phone to discuss a play that would involve J.J. and S.M. As a result of her conduct, Heard was charged with two counts of trafficking in persons and pandering obscenity involving a minor, and she pled guilty to the pandering obscenity charge in exchange for

the dismissal of the trafficking in persons charges.   (*See* Def. Ex. A.)

{¶ 66} However, the evidence that Heard knowingly attempted to recruit S.M. and J.J. to engage in sex for hire does not negate the State's evidence that White also knowingly attempted to recruit S.M. and J.J. to engage in sex for hire.   Rather, the manifest weight of the evidence reflects that Heard and White both attempted to recruit J.J. and S.M.   The State was not required to charge White with aiding and abetting in Heard's recruitment of S.M. and J.J., and, regardless, the State's evidence supported a conclusion that White, as a principal, knowingly attempted to recruit S.M. and J.J. to engage in sex for hire.   White's convictions on Counts 5, 6, 7, and 8 are not against the manifest weight of the evidence.

{¶ 67} White's second assignment of error is sustained as to Count 4 and overruled as to Counts 1, 5, 6, 7, and 8.

### III. Ineffective Assistance of Counsel

{¶ 68} In his third assignment of error, White claims that his trial counsel rendered ineffective assistance by failing to "fully and effectively cross-examine the State's witnesses with the evidence given" and by failing to properly prepare for trial.   White states that his trial counsel "could have and should have filed motions and compelled Heard's proffered testimony pursuant to her plea agreement and obtained additional evidence and witnesses to refute that testimony."

{¶ 69} To establish ineffective assistance of counsel, a defendant must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the case would have been different.

See Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Bradley, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989).   Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance.   Strickland, 466 U.S. at 688.   A defendant is entitled to "reasonable competence" from his or her attorney, not "perfect advocacy."   See Maryland v. Kulbicki, 136 S.Ct. 2, 5 (2015), citing Yarborough v. Gentry, 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam).

{¶ 70} "Strickland and its progeny establish that when a court is presented with an ineffective-assistance-of-counsel claim, it should look to the full record presented by the defendant to determine whether the defendant satisfied his [or her] burden to prove deficient performance."   Reeves v. Alabama, __ U.S. __ 138 S.Ct. 22, 26, 199 L.Ed.2d 341 (2017).   Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel.   State v. Cook, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); State v. Fields, 2017-Ohio-400, 84 N.E.3d 193, ¶ 38 (2d Dist.).

{¶ 71} "A claim of ineffective assistance of counsel cannot be asserted on direct appeal if it relies on matters outside the record."   State v. Harris, 2d Dist. Montgomery No. 27179, 2017-Ohio-9052, ¶ 19.

{¶ 72} We find nothing in the record to suggest that trial counsel rendered ineffective assistance at trial.   We have reviewed the transcript of the entire trial, and defense counsel thoroughly cross-examined S.M., J.J., and Heard about the escorting business that White was attempting to build.   White does not explain how his counsel's

cross-examinations of these and other witnesses were lacking, nor does White identify what motions should have been filed and what additional evidence should have been offered at trial. White's claim of ineffectiveness appears to rely on unidentified materials outside the record, and thus it is not properly raised on direct appeal.

{¶ 73} White's third assignment of error is overruled.

### IV. Constitutionality of R.C. 2905.32(A)(2)(a)

{¶ 74} In his fourth assignment of error, White claims that R.C. 2905.32(A)(2)(a), the trafficking in persons statute, is void for vagueness. White focuses on the statutory language that prohibits a person from knowingly attempting to recruit a person who is "less than sixteen years of age" for the purpose of engaging in sexual activity for hire. He asserts that, "[a]lthough the State proved that the victims in this case were 15 years of age at the time the offense was committed, the statute barely notified White of the conduct prohibited if he believed that both victims were 16." White further states that "the strict liability application in this statute does not provide sufficient standards to prevent arbitrary and discriminatory enforcement."

{¶ 75} At the outset, we note that White did not raise a constitutional challenge to R.C. 2905.32(A)(2)(a) before the trial court. It is well established that " 'an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.' " *State v. Awan*, 22 Ohio St.3d 120, 122, 489 N.E.2d 277 (1986), quoting *State v. Childs*, 14 Ohio St.2d 56, 236 N.E.2d 545 (1968), paragraph three of the syllabus. (Other citations omitted.) "[T]he question of the constitutionality of a statute must generally be raised at the first

opportunity and, in a criminal prosecution, this means in the trial court." (Citation omitted.) *Awan* at 122. Consequently, White forfeited his constitutional challenge to R.C. 2905.32(A)(2)(a) by failing to object to its alleged ambiguity in the trial court. *See State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 15.

{¶ 76} Nevertheless, we may consider constitutional challenges to the application of statutes in specific cases of plain error or where the rights and interests involved may warrant it. *See Dayton v. Smith*, 2018-Ohio-675, __ N.E.3d __, ¶ 30 (2d Dist.). To demonstrate plain error, it must be shown that "but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice." *Quarterman* at ¶ 16, citing *State v. Davis*, 127 Ohio St.3d 268, 2010-Ohio-5706, 939 N.E.2d 147, ¶ 29. "The burden of demonstrating plain error is on the party asserting it." *Id.*, citing *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 17.

{¶ 77} Even if we were to consider White's constitutional challenge, we would not find that the phrase "the other person is less than sixteen years of age" presents a plain or obvious error that warrants a reversal of White's trafficking in persons convictions on grounds of vagueness. "[W]hen a statute is challenged under the due process doctrine of vagueness, a court must determine whether the enactment (1) provides sufficient notice of its proscriptions and (2) contains reasonably clear guidelines to prevent official arbitrariness or discrimination in its enforcement." *Perez v. Cleveland*, 78 Ohio St.3d 376, 378, 678 N.E.2d 537 (1997), citing *Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). Although White argues he did not know that S.M. and J.J. were less than 16 years old, the statutory elements of the offense are sufficiently clear.

**{¶ 78}** White's fourth assignment of error is overruled.

## V. Prosecutorial Misconduct

**{¶ 79}** In his fifth assignment of error, White claims that the State engaged in misconduct when it offered the testimony of Heard, in accordance with a plea agreement, knowing that her testimony was not truthful or in reckless disregard for the truth.

**{¶ 80}** The test for prosecutorial misconduct is whether the prosecutor's conduct was improper and, if so, whether that conduct prejudicially affected substantial rights of the accused. *State v. Martin*, 2d Dist. Montgomery No. 22744, 2009-Ohio-5303, ¶ 15. A prosecutor's conduct during trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial. *State v. Williams*, 2d Dist. Montgomery No. 24548, 2012-Ohio-4179, ¶ 51, citing *State v. Apanovitch*, 33 Ohio St.3d 19, 24, 514 N.E.2d 394 (1987). The focus of the inquiry is on the fairness of the trial, not on the culpability of the prosecutor. *State v. Bey*, 85 Ohio St.3d 487, 496, 709 N.E.2d 484 (1999).

**{¶ 81}** Where it is clear beyond a reasonable doubt that the trier of fact would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. *See State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21. We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

**{¶ 82}** White argues that the manifest weight of the evidence demonstrates that Heard voluntarily came to Dayton, built a Backpage ad, provided sex for hire to raise money for a business, recruited S.M. and J.J. to expand her business, created photos of

them, and added them to her Backpage ad. White contends that Heard "drastically changed her story against all evidence in the case" in order to get out of jail and reduce the charges against her. White asserts that the prosecutors were aware or should have been aware that Heard's testimony would not be completely truthful, thus denying him a fair trial.

{¶ 83} The record does not support White's contention that the prosecutors knowingly or recklessly offered untruthful testimony by Heard. J.J.'s and S.M.'s testimony implicated both Heard and White. Heard's testimony during direct examination regarding White's conduct was substantially consistent with the testimony provided by J.J. and S.M. and other evidence obtained during the police investigation, including photographs from Heard's cell phone, the online Backpage ad, items located in the basement of the Lilac Avenue residence, and DNA evidence. Moreover, Heard was thoroughly cross-examined by defense counsel. During that examination, Heard acknowledged that she wanted to start a business, that she came to Dayton with White to make money for that purpose, and that she talked to J.J. and S.M. about making money on Backpage. In short, the record does not support White's contention that the State knowingly or recklessly offered perjured testimony by Heard or that her testimony deprived him of a fair trial.

{¶ 84} White's fifth assignment of error is overruled.

### VI. Conclusion

{¶ 85} The trial court's judgment as to Count 4 (pandering obscenity involving a minor) will be reversed. In all other respects, the trial court's judgment will be affirmed.

. . . . . . . . . . . . .

HALL, J. and TUCKER, J., concur.


Copies mailed to:

Mathias H. Heck
Heather N. Jans
Ben M. Swift
Hon. Timothy N. O'Connell